IN RE INTEREST OF S.C., S.J., AND B.C., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, v. C.D.C., APPELLANT.
439 N.W.2d 500

Filed May 5, 1989.   No. 88-744.

Ted N. Sleder, of Sleder Law Office, for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

BOSLAUGH, WHITE, CAPORALE, and GRANT, JJ., and RIST, D.J.

BOSLAUGH, J.

The appellant is a mother whose parental rights to her three minor children were terminated by the Douglas County Juvenile Court on July 26, 1988. The juvenile court found that the appellant had failed to comply with the terms of a reasonable rehabilitation plan, pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1988), and that the children were within the meaning of § 43-292(2), in that the mother "[had]

substantially and continuously or repeatedly neglected the [juveniles] and refused to give the [juveniles] necessary parental care and protection."

The proceeding was commenced by a petition filed by the State in the juvenile court on July 26, 1985, which alleged that the children, girls born January 3, 1980, and January 16, 1982, and a boy born September 1, 1983, were lacking proper parental care by reason of the faults and habits of the appellant mother. Specifically, the petition alleged that the mother was an alcoholic, was physically abusive to the children, had failed to provide adequate food, and had left the children alone for prolonged periods of time without adult supervision or protection. The petition prayed for termination of the mother's parental rights.

An order for immediate custody was entered on July 26, 1985, and a hearing on the petition was held on August 14, 1985. At the hearing the mother did not resist detention, and custody in the Nebraska Department of Social Services (DSS) for temporary foster care was continued.

An adjudication hearing was held on October 24, 1985. At that hearing the mother admitted that the children had been born out of wedlock and that she suffered from a "dependence upon alcoholic beverages and controlled substances," which impairs her ability to provide the necessary parental care, protection, and supervision required by the children. The other allegations were dismissed on the motion of the State, and the hearing as to termination was continued.

At the hearing on December 17, 1985, the court adopted a rehabilitation plan, which required that the mother:

1. Refrain from the usage of alcohol or illegal drugs;

2. Participate in an out-patient chemical dependency program as indicated by the terapist [sic] and enroll in an in-patient program if necessary;

3. Obtain and maintain suitable housing . . .

4. Obtain a GED and/or employment;

5. Have reasonable rights of visitation as arranged by the Child Protective Service worker;

6. Cooperate with workers on this case to include notifying the Court within 48 hours of a change in

residence or employment.

At the hearing the mother testified that she had been arrested three times since July—twice for disorderly conduct and once for solicitation of prostitution. She had spent 6 weeks in jail for soliciting and had been involved in two stabbing incidents. The mother denied having an alcohol problem, but stated that she intended to give up drinking.

Review hearings were held on March 17, 1986, June 17, 1986, February 27, 1987, August 27, 1987, and February 24, 1988.

At the March 17, 1986, hearing the court reviewed the plan of rehabilitation, ordering the same requirements, with the addition that the mother "remain free from all municipal, state or federal arrests." Count III of the original petition, relating to termination of parental rights, was dismissed without prejudice.

The probation officer testified as to the contents of her report to the court and stated that the mother had occasionally used alcohol since the last hearing, but that she had voluntarily entered an inpatient treatment program. The mother had spent a week in jail during January for disorderly conduct. She had attended but one session to obtain her GED and had missed the others.

On June 17, 1986, the matter was again reviewed; the children were ordered to remain in the custody of DSS; and the mother was ordered to undergo medical and psychological evaluations. According to the testimony and reports received at the hearing, the mother had been drinking, had been arrested for disorderly conduct, and had spent 30 days in jail for prostitution. The mother was also charged with carrying a concealed weapon. The probation officer stated that the mother had been successful in maintaining her sobriety for a couple of months, which gave the workers and the court hope that she could be reunited with her children. During the previous 3 months, the mother had not attended all of the scheduled visitations with her children because of her incarcerations. The mother had attended three visitations with alcohol on her breath and had displayed violent behavior in fighting with her family.

At the August 28, 1986, review hearing the court ordered the

mother to participate in an outpatient chemical dependency program and follow any recommendations made by medical, psychological, or psychiatric personnel. The court continued the prior requirements of the plan. The medical and psychological reports ordered at the prior review were received without objection, although none of the medical personnel testified at the hearing. The psychiatrist's report stated that the mother did not require medical treatment for depression at that time. The medical report states that she had gonorrhea, and the psychologist's report diagnosed the mother as having an antisocial personality disorder and recommended that she be evaluated to rule out chemical dependence.

At the review hearing on February 27, 1987, the court continued the above requirements and ordered the mother to participate in an inpatient chemical dependency program. The probation officer testified that during the review period, the mother had been jailed for 30 days for trespassing; that there was an outstanding warrant for her arrest for failure to pay the trespassing fine; and that she had appeared intoxicated and belligerent at a visit with her children. Further, the mother had been charged with child abuse of children who had been placed with her mother as foster children. The mother again denied having an alcohol problem, denied having been drunk when she visited her children, and strongly objected to inpatient treatment for alcoholism. In October 1986, the mother had attended a 3-day testing program for CETA, but did not attend the job training program. She had been hospitalized in September for hepatitis. The court ordered the mother begin the inpatient treatment program at the Hastings Regional Center.

At the review hearing on August 27, 1987, the probation officer reported that the mother had successfully completed the inpatient program in April, but had failed to report to her scheduled aftercare program and had started drinking again. However, the mother had entered the Lincoln Indian Center halfway house program on July 17, 1987, and was not using alcohol, was working, and was doing volunteer work at the halfway house. The court ordered that the mother complete the Lincoln Indian Center halfway house program, along with the

other requirements of the plan. The son was being followed by the specialized foster care unit of DSS because of his behavior problems. The other two children were doing fine. During her stay at the halfway house, the mother maintained contact with the children by visits and telephone calls.

The plan was again reviewed, on February 24, 1988. The court found that, although reasonable efforts had been made to reunite the family, it would be contrary to the welfare of the children to return them to the appellant, and the children were ordered to remain in the custody of DSS.

At the hearing, the probation officer reported that the mother had been suspended from the Lincoln Indian Center program on December 4, 1987, for breaking curfew and returning to the center intoxicated. She was to attend a partial care program until the time she was scheduled to enter inpatient treatment. The mother was arrested January 1, 1988, for stabbing a man in Lincoln, and had been incarcerated prior to the review hearing. The son was still in specialized foster care and was experiencing temper tantrums as a result of his uncertainty about his attachments. It was the opinion of the guardian ad litem for the children, the probation officer, the son's psychologist, and the DSS caseworker that the mother's parental rights should be terminated.

On March 21, 1988, the Douglas County attorney filed a motion to terminate the mother's parental rights based on § 43-292(6), in that reasonable efforts under the direction of the court had failed to correct the conditions leading to the determination that the children were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988). In the motion, the State requested that the court take judicial notice of its prior records pursuant to *State v. Norwood*, 203 Neb. 201, 277 N.W.2d 709 (1979).

Hearing on the motion to terminate parental rights commenced on June 16, 1988. The hearing was continued from May 18, 1988, because the appellant was incarcerated.

Vicky Traynham, a senior professional counselor with the North Omaha Alcoholism Counseling Program, testified that she saw the mother December 5, 1985, and January 7, 13, and 23, 1986. Traynham did not see the mother again until July 10,

1986. The mother was to attend counseling weekly during this period. On February 19, 1987, the mother went to Traynham, was very upset, and said that she had abused some foster children that had been placed in the care of her mother. Traynham next saw her on March 20, 1987. Between December 5, 1985, and September 1987, the mother did not successfully complete any outpatient program with the North Omaha Alcoholism Counseling Program.

Diane Sundermeier, a drug and alcohol counselor with the Lincoln Indian Center, testified that the mother began the Indian Center program on July 17, 1987. The program asked for commitments to attend AA meetings, find employment, obtain a GED, and maintain sobriety. The mother was terminated from the program in early December 1987 for violating curfew and for drinking. Sundermeier testified that the mother's greatest need was to maintain sobriety, that she did not successfully complete the Indian Center program, and that, in her opinion, the mother needed inpatient treatment.

Mildred Flansburg, a child psychologist with St. Joseph Center for Mental Health, testified concerning her treatment of the son. She testified that any time the boy was confronted with changes in his caretakers, visits from his birth family, or disappointing experiences, he would throw temper tantrums lasting an hour, throw things, kick out at people, intentionally urinate on furniture, and be unmanageable. She testified that the boy was highly intelligent and manipulative and needed a very consistent, nurturing environment to give him positive experiences for his development. She concluded that it would be very harmful for the boy to remain in foster care for an indeterminate period and that he needed more certainty about his family.

The hearing was then continued to July 25, 1988. At that time Mary Lee Schwietz, the juvenile court probation officer in charge of the case, testified in regard to the rehabilitation orders that had been entered in this case. Schwietz testified that the mother did not obtain her GED; that she was employed for only a short time, from May to July 1987 and in September 1987; that by her own admission to Schwietz, the mother did not refrain from using alcohol; that she did not consistently

participate in the outpatient North Omaha Alcoholism Counseling Program, nor did she complete the Lincoln Indian Center halfway house program; that the mother did not remain arrest-free—she was arrested various times throughout the juvenile court involvement and was in the York women's reformatory for first degree assault at the time of the termination hearing; and that she did not maintain her own housing at any point and had moved approximately 30 times since July 26, 1985.

Gwen Shuman (Opfer), the DSS caseworker assigned to the son's case, testified that during the first half of 1987, the mother did not visit her son regularly, but that during the fall of 1987, the visits were more regular. Shuman testified that the boy was having behavior problems, which were more pronounced when the boy visited with his mother or after such visits. At times when his mother was not visiting, the boy's behavior was more stable. During one visit, the boy and his mother had argued; he left throwing a tantrum; and he tried to open the car door and jump out on the way home after the visit. She testified that the boy had threatened in the past to stab people when he was angry and having tantrums.

Lillie Carther, a social worker in charge of this case for Child Protective Services, testified that she arranged the visits the children had with their mother. She testified that the mother had problems with following the rules for the visits, arrived with unauthorized other persons, and had smelled of alcohol when she visited. At one visit in June of 1986, the mother was threatening to take her children away, "she was out of control, angry, sort of wild acting," and appeared inebriated. The children were very frightened after that visit, and the two girls had actually waited on the porch of the foster home for their mother to get them. On February 3, 1987, the mother arrived at the visit very angry and loud, smelled of alcohol, and admitted having drunk alcohol. In Carther's opinion, the children needed more stability, and 3 years in foster care was long enough. With regard to visitation, in 1986, the mother missed 11 of 50 visits with no excuse; in 1987, she missed 16 visits of 42 possible; and in 1988, she missed all 28 possible visits. Carther testified that she did not think the mother had complied with

the court's orders, though Carther had told the mother that she risked losing her parental rights if she failed to comply. The mother made no excuse for her failure to comply with the orders.

The mother testified that she loved her children. With regard to her alcohol problem, on direct examination the mother testified:

Q. All right. Do you have an alcohol dependency problem?

A. Yes, I do.

Q. Would you explain to the Court what happens when you have a drink?

A. I just — if I have a drink or two, really nothing. I'd just be kind of high at times. That's about it.

. . . .

Q. Do you feel you now have an alcohol related problem?

A. Do I feel I do now?

Q. Yes.

A. No, I don't.

Q. All right. At the time that — at the time you left the Indian Center, do you feel you had an alcohol related problem?

A. No.

On cross-examination the mother testified:

Q. You deny you have an alcohol problem; is that correct?

A. Do I deny it? No, I don't deny it.

Q. Okay. You do have an alcohol problem?

A. Somewhat I do. I feel it's under control now, and it would be under control if I was not incarcerated.

. . . .

Q. However, when you had your kids, you admitted you had an alcohol problem that impaired your ability to provide the necessary care, protection and supervision.

A. That's not true. When I had my kids, I wasn't no alcoholic.

Q. Didn't you admit to that?

A. I admitted I drank on occasion, but I was no

alcoholic. When my kids was with me, I don't admit to being no alcoholic.

. . . .

Q. When your kids are not with you, generally speaking not with you, are you saying you do drink?

A. Yeah, I drink.

Q. On occasion?

A. Yes, that's true.

Q. What are the occasions?

A. Just friends coming over and want to get high, meaning — getting high is going to drink a little gin or something. Sure, why not.

Q. Do you feel you can handle drinking today?

A. Do I feel I can handle it? No, I wouldn't do it because I feel alcohol is not important in my life. My three kids is what's important to me, and I feel if I was out now I wouldn't be drinking because I need my kids with me, not in a foster home. I feel I'm capable of taking care of my kids. I feel they want to be with me, too.

The mother testified that she had not obtained her GED, but was to begin testing for it when she returned to the York facility; that she had not had any alcohol in the last half of 1987 and none in 1988; that she had lived with her mother the entire time the court was involved; and that she consistently visited her children, except when she was in treatment or incarcerated. She testified that she had tried to find employment and had two jobs for short periods. She admitted that maybe she needed to look a little harder. She testified that she had not provided her children with a home for the past 2 years, but had attempted to do so. The mother denied that she was drinking when she committed the first degree assault, and said that she was trying to prevent the man from "trying to hit on [her]." She denied that she had been drinking the night she broke curfew at the Indian Center, for which she was terminated from the program. She denied on cross-examination that her arrests were alcohol-related, and stated that she was protecting herself.

At the end of the State's case, over objection, the court took judicial notice of all the records, exhibits, and orders in the case.

Throughout these proceedings, the mother was present and represented by counsel, and the children were represented by a guardian ad litem.

The appellant has assigned as error the admission of hearsay reports in evidence, the finding by clear and convincing evidence that the mother willfully failed to comply with the reasonable provisions of a court-ordered plan, and the finding that termination of the mother's parental rights was in the best interests of the children.

With regard to the first assignment of error, there is a complete verbatim report of the proceedings in the juvenile court, and the reports which the appellant complains about were received in evidence without objection. At many of the hearings, the authors of the reports were present in court and could have been subjected to cross-examination. There is no showing that any of the authors of the reports were not available and that their attendance could not have been compelled by subpoena.

However, it is unnecessary to discuss the first assignment of error further because there is an abundance of sworn testimony in the record that supports a finding by clear and convincing evidence that the appellant willfully failed to comply with the rehabilitation order of the juvenile court and that it is in the best interests of the children that the parental rights of the mother be terminated.

> In an appeal from a judgment or order terminating parental rights, the Supreme Court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code.

*In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 266, 417 N.W.2d 147, 157 (1987).

> " 'In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial

court observed the witnesses and accepted one version of the facts rather than another.' "
*In re Interest of L.O. and B.O.*, 229 Neb. 889, 889-90, 429 N.W.2d 388, 389 (1988); *In re Interest of J.S., A.C., and C.S., supra.*

The children in this case have been under the court's jurisdiction since August 14, 1985, and the mother admitted on October 24 that she could not take care of her children due to her alcoholism. When the children were adjudicated to be juveniles within the meaning of § 43-247(3)(a), the court ordered a rehabilitation plan. The essence of this plan throughout these proceedings has been to require that the mother maintain her sobriety, participate in various inpatient or outpatient chemical dependency programs, obtain employment and a GED, obtain suitable housing, have reasonable visitation, and cooperate with workers on the case in notifying them of her whereabouts and her employment situation.

Therefore, regarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child.

*In re Interest of J.S., A.C., and C.S., supra* at 267-68, 417 N.W.2d at 158. Materiality is defined as a provision in the plan which tends to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code. *Id.* See, also, *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988).

The appellant did very little to comply with the provisions of the plan. Clearly, sobriety was a material provision of the plan. The mother's alcoholism was the basis for the adjudication that the children were as those defined in § 43-247(3)(a). The mother's maintaining her sobriety would have tended to correct the condition which led to the adjudication. Yet, the mother did not maintain her sobriety for any extended period throughout

the court's involvement. She participated in two inpatient treatment programs, but failed to participate in aftercare programs designed to help her maintain her sobriety. During the final review periods prior to the filing of the termination motion, the mother participated successfully in a halfway house program for a while and was employed for two short periods. However, she failed to maintain her sobriety and ultimately was involved in a stabbing for which she was sentenced to the York women's reformatory. Although she testified at the hearing on the motion to terminate that she felt her alcohol problem was under control, her actions speak louder than her words. At the hearing she was equivocal in admitting that she had an alcohol problem.

During this proceeding, the mother never obtained independent housing, but lived with her mother, her stepfather, and various friends. She never established a home at which she could receive custody of her children. In fact, at the time the motion was filed, the mother was in prison and was not requesting custody of the children. The mother did not complete her GED, although she was given several opportunities to do so. At the termination hearing, the mother testified that while in the York facility, she was working on her GED and would begin testing for it soon. This was too little, too late. The mother did not remain arrest-free for any extended period of time. She was arrested for disorderly conduct, soliciting prostitution, trespassing, and, finally, first degree assault. Although she did exercise her visitation rights on occasion, she failed to comply with the most important terms of the plan, which were designed to correct the adjudication that the children were juveniles as defined by the Nebraska Juvenile Code.

The mother admitted at the adjudication hearing that she had an alcohol problem. Instead of following the court's direction, which was designed to help her correct the situation, the mother ignored the plan. She failed to get her alcohol problem under control. She failed to create an environment under which she could again accept custody of her children. She had no income and no home. She was reported to have been drinking in December 1987, just before the petition was filed.

A psychologist testified that the son was having severe behavior problems, specifically because of his unstable situation. The daughters were reported to be doing well in foster care, but the caseworkers testified that the children would be better off in a permanent situation. As we have stated before, " 'A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity.' " *In re Interest of Z.D.D. and N.J.D., supra* at 243, 430 N.W.2d at 556.

We find by clear and convincing evidence that the mother willfully failed to comply with the reasonable provisions of the rehabilitation plan and that it was in the best interests of the children to terminate her parental rights. The judgment is affirmed.

AFFIRMED.