445 N.W.2d 599 (1989)
233 Neb. 338
In re Interest of J.H., H.H., L.H., M.H., and R.H., Children Under 18 Years of Age.
STATE of Nebraska, Appellee,
v.
V.H., Appellant.
No. 88-513.
Supreme Court of Nebraska.
September 15, 1989.
*601 Dean M. Johnson, for appellant.
Ronald L. Staskiewicz, Douglas County Atty., and Bridgitt Brochtrup Blankenau, Omaha, for appellee.
Before HASTINGS, C.J., and WHITE, SHANAHAN and FAHRNBRUCH, JJ., and McGINN, District Judge.
McGINN, District Judge.
V.H. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights with regard to five of her children, J.H., H.H., L.H., M.H., and R.H. We affirm.
On April 4, 1985, a petition to terminate the parental rights of V.H. was filed in the separate juvenile court of Douglas County. The petition alleged that J.H. (age 10), H.H. (age 9), L.H. (age 7), A.B. (age 4), M.H. (age 3) and R.H. (age 1) were within the meaning of Neb.Rev.Stat. § 43-247(3)(a) (Cum.Supp.1982), lacking proper parental care by reason of the fault or habits of V.H., the natural mother, and within the meaning of Neb.Rev.Stat. § 43-292(2) (Reissue 1988), having a natural parent, V.H., who has substantially and continuously or repeatedly neglected said children and refused to give the necessary parental care and protection.
At the hearing on the petition, V.H. admitted several of the allegations contained in the petition. The court found J.H., H.H., L.H., A.B., M.H., and R.H. to be within §§ 43-247(3)(a) and 43-292(2) and retained jurisdiction over the children, with physical custody of all the children except A.B. given to the Department of Social Services. A.B. was placed in the physical custody of D.B., the natural father. The court took the motion to terminate V.H.'s parental rights under advisement.
Following a dispositional hearing on September 4, 1985, the court established a rehabilitation plan which required V.H. to (1) undergo a chemical dependency evaluation and psychological and psychiatric evaluations, and obtain the treatment indicated; (2) maintain her employment and provide verification of income on a monthly basis; (3) obtain suitable housing (at a minimum, a one-bedroom residence) within 60 days and maintain the same residence for 60 consecutive days before the next hearing, maintain adequate housekeeping standards and furnishings, and provide monthly rent receipts; (4) notify the court of any change in employment or residence within 48 hours; and (5) meet with the juvenile court probation officer once a month to establish goals for the month. V.H. was also granted reasonable visitation with the children, to be arranged by Child Protective Services.
The first review hearing was held January 6, 1986. After evidence was presented on V.H.'s compliance with the rehabilitation plan, the court terminated its jurisdiction over A.B. and granted permanent custody to D.B., the natural father. The court retained jurisdiction over the remaining five children and continued the rehabilitation plan with some modifications. First, V.H. was ordered to participate in a YWCA alcohol awareness program. Second, the court ordered counseling for J.H., H.H., and L.H. to deal with behavior problems the children were experiencing, with V.H. participating as required. Last, the visitation schedule was adjusted to deal with problems V.H. had controlling the children when she visited all five at one time. Visitations were split so that V.H. visited M.H. and R.H. weekly and visited J.H., H.H., or L.H. once every 3 weeks on a rotating basis.
Further review hearings were held on May 6, 1986, July 31, 1986, October 31, 1986, and May 18, 1987. At each hearing, *602 evidence was presented showing the extent of V.H.'s compliance with the rehabilitation plan since the last hearing. After each hearing, the court retained jurisdiction over the five children and continued the rehabilitation plan in essentially an identical form. Beginning with the order after the May 6, 1986, hearing, V.H. was ordered to attend relinquishment counseling aimed at helping her assess her capabilities to parent and determine if voluntary relinquishment was in the best interests of the children.
A motion for termination of parental rights was filed on September 18, 1987. On January 19, 1988, V.H. moved for increased visitation with the children. A hearing on the motions began on February 10, 1988, and continued on April 14, with the motions heard in the order in which they were filed. At the conclusion of the hearing, the juvenile court found there was clear and convincing evidence to support the motion for termination and ordered V.H.'s parental rights over J.H., H.H., L.H., M.H., and R.H. terminated. Having terminated V.H.'s parental rights, the court took no action on the motion for additional visitation.
V.H. filed a motion for new trial and a motion for visitation pending a determination of the motion and during the pendency of any appeal. Both motions were overruled. This appeal followed.
In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the court to reach a conclusion independent of the findings of the trial court. Where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. In re Interest of E.B., 232 Neb. 653, 441 N.W.2d 637 (1989); In re Interest of S.C., S.J., and B.C., 232 Neb. 80, 439 N.W.2d 500 (1989).
This case began on March 21, 1985, when the Omaha Police Division received an anonymous telephone call concerning minor children left alone in a residence at 2411 Laurel Avenue in Omaha, Nebraska. Upon investigation, the police found J.H., H.H., L.H., A.B., M.H., and R.H. alone in the residence. The residence was described as being in a state of total disarray. The burners on the electric stove were turned on and were red hot. The police immediately took the children into protective custody.
V.H. admitted the children were alone, the burners were on, and the house was in disarray. She also admitted (1) garbage, trash, dirty clothes, and animal and human waste were scattered throughout the house; (2) a putrid odor permeated the entire residence; (3) J.H. and H.H. had been observed at school on numerous occasions in very dirty clothing and in dire need of bathing; (4) school personnel bathed and gave new clothes to J.H. and H.H.; and (5) V.H. had been informed of the hygiene problems by school personnel, but had not cooperated in correcting the problem. V.H. stated she had left the children alone for about 20 minutes while she went to the store for food. She explained the condition of the house as being partially the result of the gas and water being turned off for not paying the utility bill and partially the result of plans to move at the end of the month.
Photographs were introduced to show the condition of the house on the date the children were taken into protective custody. The pictures showed clothes piled throughout the residence; the bathroom stool unflushed; dishes left unwashed in the kitchen sink; little food in the refrigerator, which needed to be cleaned; and liquor bottles, some of which appeared to contain alcohol, prevalent in the residence.
According to V.H., she was receiving $560 per month in aid to dependent children payments. She paid $250 per month rent for the Laurel Avenue residence. Also, V.H. owed $30 to the Omaha Public Power District and $400 to the Metropolitan Utilities District for unpaid utility bills and $225 to friends and relatives for various loans. By the time of the dispositional hearing, two warrants had been issued for V.H.'s arrest due to nonpayment of fines. V.H. *603 owed $180 on a $220 fine for one count of child abuse/neglect (stemming from the March 21 incident) and another $40 fine on a ticket for improper turning.
V.H. had been previously convicted of child abuse/neglect in 1982. The charge resulted in the five oldest children being placed under the jurisdiction of the juvenile court from July 27, 1982, until November 6, 1984. The previous involvement of the juvenile court was terminated after the court found further intervention would be to no avail and would be unnecessary.
At the final hearing, extensive evidence was introduced concerning V.H.'s compliance with the court-ordered rehabilitation plan and the effect the proceedings were having on the children. The court also took judicial notice of all reports introduced at the review hearings.
In the approximately 2½ years in which the children were under the jurisdiction of the juvenile court, V.H. held roughly 10 jobs, some for only 2 weeks. Within this time, she had also been unemployed for several months. She was terminated at two jobs because of her attendance record, and she lost another job because of a complaint about alleged contact with a customer. She voluntarily left other jobs for various reasons. When she was employed, she frequently did not provide income verification as required by the court.
In the same time period, V.H. reported approximately 15 different residences. V.H. did not timely inform the probation officer of all the changes in residences. In most of these residences, she was living in the homes of friends or relatives or in shelters. Only two of the reported residences were independent, one of which she obtained in December of 1987, after the motion to terminate parental rights was filed. For about 6 months, she received room and board in exchange for caring for an elderly gentleman. The probation officer inspected the situation and classified it as inadequate. There was also a 6½month period between October 1986 and May 1987 when there was no contact with V.H., and she did not report her whereabouts. Further, in the entire 2½year period, V.H. supplied only two rent receipts, showing payment of $130 toward rent of $250.
V.H.'s visitation with her children deteriorated over the 2½ years of court supervision. According to Lillie Carther, the DSS caseworker in charge of the children while they were under the court's jurisdiction, V.H. made 33 of 36 possible visits in 1985, 40 of 48 possible visits in 1986, 18 of 48 possible visits in 1987, and 8 of 15 possible visits through April of 1988. V.H. explained the decreased visitation was due to a change in DSS rules concerning the timing of arranging visits. She stated she was not always able to get to a phone before the deadline. Carther testified she tried to accommodate V.H. even if she called in late.
At the beginning, an observer described the visits as containing "a great deal of yelling, fighting, [and] throwing things (toys)." Visits attended by V.H.'s mother were "calmer" than when V.H. was there alone. The CPS observer described the children as "wild and out of control." The worker also described V.H. as "oblivious" to the conduct of the children. Later observations indicate V.H. was unable to maintain control of the children during visits. Observers described the children as "animals" during the visits, saying, "They climb all over everyone else and hit each other, [and] run wild in the halls." J.H., H.H., and L.H. would enter offices in the building where the visitations occurred and steal items out of desks. On several occasions, M.H. returned to the foster home with bruises and scratches. These problems appear to have been corrected when the visits were split.
V.H. was occasionally late for the scheduled visits. She excused the tardiness and failure to keep appointments as due to lack of transportation, although DSS provided bus tickets and cabfare to assist in getting to appointments.
The record shows V.H. virtually vanished between December 1986 and May 1987. V.H. did not visit any of the children between December 4, 1986, and May 14, 1987. She had no contact with H.H. from October *604 30, 1986, until May 1987. Further, she contacted her probation officer only once and did not attend the relinquishment counseling during the October to May period. She did not maintain steady housing or employment and did not report changes in housing and employment during this time period. V.H. explained the lack of contact was due to depression over not having a job or her own housing; also, she stated she had been sick with bronchitis and a slight case of pneumonia.
The evidence overwhelmingly shows this absence caused the children to wonder if something was wrong with V.H. and even to fear she might have died. During the absence, however, the behavior of the children improved, only to deteriorate again once V.H. returned.
V.H. underwent chemical dependency testing. Although V.H. was not chemically dependent, the counselor recommended participation in an alcohol education program designed to increase awareness of the warning signs of alcohol abuse. V.H. completed the program on October 21, 1986.
The ordered psychological and psychiatric evaluations were conducted in April 1986. Ravinder P. Mediratta, M.D., of the Creighton University department of psychiatry, determined V.H. did not suffer from any mental illness, psychotic disorder, organic brain disorder, or personality disorder which would interfere with her ability to take care of the children. Thomas A. Korn, Ph.D., from St. Joseph Center for Mental Health, conducted the psychological evaluation. According to Korn, V.H.'s "ability to model an adequate social behavior and her judgment in parenting and child care issues is [sic] highly questionable."
Further, V.H. made less than 75 percent of her monthly meetings with the probation officer. The record also indicated V.H. attended only one session of relinquishment counseling after it was ordered on May 6, 1986.
At various points during the court's supervision, J.H., H.H., L.H., and M.H. underwent evaluation and counseling, necessitated by behavior problems. These problems included fighting at school and in the foster home, running away from the foster home, stealing, and sexual conduct inappropriate for their age groups. J.H., L.H., and H.H. all received inpatient evaluations at St. Joseph Center for Mental Health. The foster placements of several of the children had to be changed as a result of their behavior problems.
Gwen Opfer, the DSS worker in charge of L.H.'s foster care between October 1986 and June 1987, testified she had no contact at all with V.H. during the time she was in charge of L.H. and could not reach V.H. to arrange visits. L.H.'s foster mother told Opfer there was some visitation in November, but, otherwise, there were no cards, letters, gifts, or phone calls from V.H. during that time. Because of V.H.'s absence, L.H. expressed the fear that V.H. was dead. In June 1987, L.H. moved to Lincoln to live with his grandmother. David Hammer became the worker in charge of L.H.'s case. Hammer testified, in the time L.H. had been in Lincoln, V.H. had never contacted Hammer to arrange visits. The grandmother told him V.H. visited on approximately four occasions and called less frequently. In Hammer's opinion, the extended periods of time during which there was no contact between L.H. and his mother was not in the child's best interests and caused L.H. concern. Also, Hammer stated the placement with the grandmother had been good for L.H., and L.H. wished to stay with the grandmother.
Kendal Osbahr, director of the Blondo Treatment Facility, where H.H. was placed from September 5, 1986, until November 24, 1987, testified as to V.H.'s relationship with H.H. During the time H.H. was in the facility, V.H. was ordered to participate in H.H.'s therapy and in parenting classes at the facility. Visitations were scheduled either immediately before or after the therapy sessions. Of a possible 55 sessions, V.H. attended only 11. In Osbahr's opinion, V.H.'s attendance at the parenting classes was too infrequent to make progress in dealing with H.H.'s behavior problems. During his stay at the facility, H.H. expressed concern over V.H.'s not *605 visiting, especially during her absence between October 1986 and May 1987. Osbahr stated it was her opinion that the inconsistency of V.H.'s visits was not in H.H.'s best interests.
In the opinion of Carther, the children's behavior problems during visitations were caused by instability brought about by the presence of V.H., and it would be in the best interests of all the children for V.H.'s parental rights to be terminated. From the beginning, the consensus of the social workers involved in the case recommended termination of V.H.'s parental rights.
V.H. makes five assignments of error, which will be dealt with in order.
V.H. first claims the juvenile court erred in finding there was sufficient evidence to support the termination of her parental rights. The second assignment of error claims the court did not determine it was in the best interests of the children for V.H.'s rights to be terminated. These two arguments overlap and will be discussed together.
A judgment terminating parental rights will be affirmed where the State has proved by clear and convincing evidence that the parent has willfully failed to comply with a rehabilitative plan ordered by the juvenile court, and it is in the best interests of the children that parental rights be terminated. In re Interest of E.B., 232 Neb. 653, 441 N.W.2d 637 (1989); In re Interest of S.C., S.J., and B.C., 232 Neb. 80, 439 N.W.2d 500 (1989).
A parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation designed to reunite the parent with the child presents an independent reason justifying termination of parental rights. In re Interest of P.D., 231 Neb. 608, 437 N.W.2d 156 (1989); In re Interest of D.L.S., 230 Neb. 435, 432 N.W.2d 31 (1988).
The record supports the juvenile court's determination that V.H. failed to comply with the rehabilitation plan. She received repeated warnings from the court and the probation officer that there was a strong possibility her parental rights would be terminated if she did not at least make a reasonable attempt to comply with the plan. V.H. testified that financial problems were the cause of failure to comply, but the evidence also shows that she lost jobs because she did not show up for work and that she quit jobs because she was not being paid what she considered enough money. Also, at the hearing of May 18, 1987, V.H. stated she did not want a job that was only going to pay "three something an hour." She also acknowledged at that hearing that she had made no effort during the previous 6 months to contact the caseworker or probation officer and that if one of her children had become gravely ill during that period, no one would have known how to find her. On this record, we find there was more than sufficient evidence to find V.H. failed to comply with the court-ordered plan.
The juveniles' best interests are the primary considerations in considering whether parental rights should be terminated. In re Interest of L.H., 227 Neb. 857, 420 N.W.2d 318 (1988); In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 417 N.W.2d 147 (1987). Where a parent is unable or unwilling to rehabilitate herself within a reasonable time, the best interests of the children require termination of the parental rights. In re Interest of P.D., supra.
The record is clear that the disruption in the lives of the children was enormous. Between 1982 and 1988, the children had been under the jurisdiction of the court for all but approximately 6 months. Children cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. In re Interest of S.C., S.J., and B.C., 232 Neb. 80, 439 N.W.2d 500 (1989); In re Interest of Z.D.D. and N.J.D., 230 Neb. 236, 430 N.W.2d 552 (1988).
Further, the testimony of the caseworkers involved with the children shows the children fared better during the 6-month period in which they had no contact with V.H. There is sufficient evidence that termination *606 of V.H.'s parental rights is in the best interests of the children.
The third assignment of error claims the rehabilitation plan was not reasonable in that it did not adequately provide for the correction of the problems which led to the filing of the original petition.
A juvenile court has discretionary power to prescribe a reasonable plan for parental rehabilitation to correct conditions underlying the adjudication that a child is a juvenile within the juvenile code. In re Interest of L.H., supra.
V.H.'s main argument claims a one-bedroom apartment, which the plan required her to obtain, was, by definition, insufficient for herself and her five children. While it is obvious six people in a one-bedroom residence would indeed be crowded, it should be noted the court established that as a minimum; V.H. was free to obtain more spacious living quarters. At the termination hearing, the probation officer addressed this issue, stating, "The reason for the one bedroom was to get [V.H.] on her feet so that we could start moving the children home...." She further testified, "We were willing to work with the mother for her to start with a one bedroom and work into a larger residence that would accommodate all five children...." The one-bedroom specification appears to have been an acknowledgment that, at the time of the first hearing, V.H. may not have had the financial resources to obtain a larger, presumably more expensive, residence. The major focus was on having V.H. maintain a steady residence that was properly furnished and kept in order.
At the time the court took jurisdiction over the children, a large part of the problem was the conditions in which the children were living. The housing requirement was intended to rectify this shortcoming. The plan never developed further because of V.H.'s own actions.
The employment requirement was needed to assist V.H. in maintaining adequate housing. The other requirements were aimed at assisting V.H. in reaching the goal of reunification of the family. As such, the plan adopted by the court appears to have been a reasonable attempt to correct the conditions which lead to the original adjudication. Therefore, the court did not abuse its discretion in the formulation of the plan.
V.H. also relies on the psychiatric and psychological evaluations, which recommend reunification of V.H. and her children with long-term supervision by DSS. According to V.H.'s brief, since these recommendations were not followed, the plan was not reasonable.
It should be noted these evaluations did not make an unqualified recommendation for reunification. Dr. Korn's evaluation stated:

If in the wisdom of the court, the ... children are reunited with their mother in the home environment, it would appear that a lengthy (one year) trial period during which continuous weekly monitoring and concurrent remediation of [V.H.'s] parenting and child care practices be carried out in order to insure the health and well-being and adequate social functioning of the children.
(Emphasis supplied.) Dr. Mediratta stated: "She may be given partial responsibility to take care of her children ... under very close Welfare supervision, maybe starting with one or two children." (Emphasis supplied.)
V.H.'s argument ignores the fact that at no time during the court's involvement was there any type of residence in which to reunite the family. Reunification of the family, under the conditions which existed, would in all likelihood have led to a continuation of the problems which the family was experiencing in March 1985. The court did not err by not acting upon the recommendations found in these evaluations.
V.H. also claims there was not sufficient evidence that her noncompliance was willful. The record shows, during the 2½ years preceding the filing of the motion to terminate her parental rights, V.H. was unable or unwilling to maintain steady employment and independent housing. She *607 did not even maintain one residence for any length of time. She was evicted for nonpayment of rent from the only independent housing she had during this time. V.H. had the probation officer visit at least one prospective residence, but never moved into it even though it was adequate. At one point in time, V.H. had $550 in savings but did not obtain the required housing. It appears she used at least part of the money to purchase an automobile which was not in good condition. Upon this record, we cannot say the failure to comply with the plan was not willful.
Fourth, V.H. claims the court erred in not granting her visitation with her children pending the appeal to this court. "After parental rights have been terminated, visitation while an appeal is pending would not be in the best interests of children who already have been in limbo for months or years." In re Interest of Z.D.D. and N.J.D., 230 Neb. 236, 243, 430 N.W.2d 552, 556 (1988). Clearly, the court did not err in refusing to grant V.H. visitation during this appeal.
Lastly, she claims the termination hearing did not comply with the requirements of due process because (1) there was a substantial delay between the filing of the motion for termination and when the actual hearing was held and (2) the court did not allow evidence to be presented as to V.H.'s compliance in the time between the filing of the motion and the actual hearing.
The only reference in the record to the length of time between the filing of the motion in September 1987 and the hearing in February 1988 indicates the delay was in part due to continuations requested by V.H. Appellant has not provided a record upon which we may properly evaluate this argument. Therefore, we find there was no prejudice caused by the delay.
V.H. also claims she was denied due process because certain evidence concerning compliance with the court order since the filing of the motion in September 1987 was not admitted. A review of the evidence introduced at the hearing on the motion to terminate shows, however, that evidence was admitted as to V.H.'s compliance with the rehabilitation plan since the time the motion was filed. Evidence was received concerning V.H.'s employment, housing, visitation with her children, and meeting with the probation officer.
The only evidence to which an objection was sustained because of the timeframe involved was certain testimony of the foster mother of M.H., who was also a friend of V.H. This testimony concerned V.H.'s church attendance, a matter which the court found irrelevant. The court sustained an objection to certain testimony regarding contact between the foster mother and V.H., apparently because the timeframe was not specified. No offer of proof was made, nor is the substance of the evidence apparent from the context in which it was offered. "Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." Neb.Rev.Stat. § 27-103(1) (Reissue 1985); Hulse v. Schelkopf, 220 Neb. 617, 371 N.W.2d 673 (1985). On the record before this court, we fail to see how any substantial right was affected by the exclusion of the above evidence.
The due process assignment of error is without merit.
The judgment of the separate juvenile court of Douglas County terminating V.H.'s parental rights over J.H., H.H., L.H., M.H., and R.H. is affirmed.
AFFIRMED.