IN RE INTEREST OF STACEY D. AND SHANNON D.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
PAM N., APPELLANT.

684 N.W.2d 594

Filed August 3, 2004.   No. A-03-818.

Sandra E. Stern for appellant.

Stuart J. Dornan, Douglas County Attorney, and James M. Masteller for appellee.

CARLSON, MOORE, and CASSEL, Judges.

MOORE, Judge.

## INTRODUCTION

Pam N. appeals from an order of the separate juvenile court of Douglas County, Nebraska, that terminated her parental rights to her two minor children based upon the grounds set forth in Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 1998). For the reasons set forth herein, we affirm in part, and in part reverse and remand for further proceedings.

## BACKGROUND

Pam is the natural mother of Shannon D. and Stacey D., who were ages 9 and 11, respectively, at the time of the last termination hearing on June 9, 2003. Pam was unemployed and had been receiving disability benefits since 1991 due to an injury that resulted in permanent disability. Pam is also the parent of two other children who have reached the age of majority and are not subject to the instant proceedings. Although Pam was married to George N. at the time of Shannon's and Stacey's births, the record reflects that Ron D. may be the biological father of Shannon and Stacey. Our record does not contain an order determining Ron's paternity, although genetic testing was apparently performed at some point during the proceedings. Pam and Ron have never been married. On November 27, 2002, the State moved to have Pam's parental rights terminated. The termination proceedings consisted of a series of hearings held on March 12, April 7, May 14 and 19, and June 9, 2003.

On July 7, 2000, Shannon and Stacey were brought to the attention of the Department of Health and Human Services (the Department) after the Omaha Police Department discovered Shannon and Stacey living with Ron in a tent in an Omaha park. At the time the girls were discovered, Pam was incarcerated and Ron was at work and had allegedly left the girls in the care of another camper in the immediate area, but no one else was present or in the vicinity. Ron and the two girls had been living in the tent for approximately 4 weeks. Shannon and Stacey were immediately placed in protective custody. On October 11, the two girls were adjudicated because they lacked proper parental care by reason of the faults or habits of Pam and Ron in that Pam and Ron had failed to (1) provide proper and sufficient housing, (2) provide for the girls' medical needs, and (3) provide proper parental supervision and care. See Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002). The State further alleged that Shannon and Stacey were at risk for harm based upon the above-stated allegations.

Following the adjudication hearing, Pam and Ron were ordered to undergo psychiatric evaluations and to complete chemical dependency evaluations. In December 2000, Pam underwent an abbreviated mental health examination at the Immanuel Medical Center. Dr. Philip McLeod, a clinical psychologist, testified that

he conducted the initial evaluation of Pam, that he diagnosed her with major depression, and that she needed treatment at the time. McLeod testified that during his initial interview with Pam, he found that Pam attributed a considerable amount of externalization for many of the troubles that have occurred in her life, including the removal of Shannon and Stacey from Pam's care, and did not see herself as being responsible for many of the occurrences. McLeod further testified that Pam reported she had been a user of heroin in the past and also took an assortment of other drugs for anxiety attacks. After this initial evaluation, McLeod did not have any further contact with Pam until February 2002.

In July 2001, Camas Diaz, a protection and safety worker for the Department, was assigned to this case. At that point in time, Pam had been incarcerated at the York Correctional Center for Women since June 2001 on a felony shoplifting conviction and was scheduled to be released in August. However, due to Pam's noncompliance with her prison treatment plan and goals, Pam was not released until December 2001.

In a September 25, 2001, report prepared for the court, Diaz stated that Pam had not yet completed the psychiatric or chemical dependency evaluations. Diaz reported that Shannon and Stacey were doing well overall and had been referred for individual therapy. Diaz also noted in the report that while Pam was incarcerated, Pam initiated involvement in the prison's parenting program which allowed her to have extended visits with the girls, and that Pam exercised regular visitation during this time. As of the date of this report, the primary permanency plan was reunification.

In September 2001, Shannon and Stacey started therapy with Gretta Crisman, a social worker and mental health therapist. Crisman testified that Shannon and Stacey were referred to her because the two girls were fighting among themselves and because they were struggling with the uncertainty of not knowing when they were going to be returned to Pam and Ron. Crisman further testified that the two girls had issues with self-esteem, anger control, relationship and friendship skills, and adjustment to their new environment. Crisman met with Shannon and Stacey on a weekly basis and reported in March 2002 that the girls had made significant progress. Crisman indicated that family therapy began in March, but that Pam and Ron consistently canceled or

did not show up for appointments, which behaviors caused frustration and disappointment for Shannon and Stacey.

On December 28, 2001, Diaz prepared a second report for the court. Diaz reported that Pam had still not completed the psychiatric and chemical dependency evaluations as previously ordered and that Pam had scheduled and missed several appointments at Immanuel Medical Center, which behavior resulted in Immanuel Medical Center's refusing to any longer accept Pam for an evaluation. The Department subsequently referred Pam to Greater Omaha Community Action to complete the evaluations, but Pam again failed to attend those scheduled appointments. Diaz further reported that Pam and Ron had been regularly exercising supervised visitation with Shannon and Stacey. The permanency objective continued to be reunification to be achieved by April 30, 2002, with a concurrent plan of adoption or guardianship.

In preparation for a review hearing scheduled for March 21, 2002, Diaz updated the court in a letter dated March 18, 2002, which stated that Pam had completed a psychological evaluation in February at Immanuel Medical Center rather than a psychiatric evaluation, but that Pam had scheduled a psychiatric evaluation for the end of March. McLeod conducted the psychological evaluation of Pam and again diagnosed Pam with major depression and noted a history of social anxiety. McLeod further testified that based upon his limited evaluation and judgment, Pam's capacity to successfully parent two children was "at best marginal." The record also reflects that Pam completed a chemical dependency evaluation on January 14, 2002, at Richard Young Center. That evaluator concluded that Pam did not need any further chemical dependency services, but noted that she was likely addicted to her pain medication and that this issue should be further evaluated. Thereafter, Pam tested positive for cocaine on June 28.

Pam voluntarily sought to be evaluated at the University Drug and Alcohol Program in June 2002 to determine if she was eligible for the methadone maintenance program. Dr. Donald Swanson, a psychiatrist with the University of Nebraska Medical Center and former medical director of the University Drug and Alcohol Program, testified that he conducted the initial evaluation of Pam on June 4. During the evaluation, Pam admitted to recent use of opiates, cocaine, and amphetamines. She further admitted

to using numerous other substances, such as heroin, on a regular basis during her lifetime. As a result of the initial evaluation, Swanson determined that Pam was eligible to participate in the program and recommended that she start treatment. Thereafter, Pam started treatment, and over the course of approximately the next 7 months, Pam's compliance with the program was continuously determined to be unsatisfactory in that Pam failed to attend group and individual therapy sessions on a regular basis, had positive urine analyses, and was delinquent on the payment of program fees. Swanson testified that at the time of trial, Pam was still a patient in the program.

The record reflects that Pam also participated in a drug and alcohol evaluation at Helem's Counseling and Consulting Services (Helem's) in August 2002. Frances Isaacson, a chemical dependency counselor and program coordinator for the substance abuse program at Helem's, testified that during the course of Pam's evaluation, Pam admitted to having serious problems with heroin, cannabis, and cocaine and considered herself an intravenous drug user. Isaacson also testified Pam indicated that she did not need any substance abuse treatment and that her use of illegal drugs was under control. Isaacson recommended outpatient treatment for Pam in addition to attendance at "12 step meetings" and support groups. In September 2002, Pam started a 12-week outpatient treatment program at Helem's. Isaacson testified that Pam had very poor attendance at individual and group therapy sessions, had positive urine analyses (but denied that she had used drugs), and ultimately did not complete the program. Isaacson stated that Pam always had numerous excuses as to why she did not attend and that Helem's eventually lost contact with Pam.

On August 19, 2002, a third report was prepared for the court and submitted by Diaz. Diaz reported that Shannon and Stacey had been in foster care for 25 months and that the permanency objective continued to be reunification with a concurrent alternative plan of adoption. Diaz also reported that Pam had completed a court-ordered parenting class and that there was an ongoing concern about housing. Diaz testified that Pam and Ron had lived in approximately four to five different locations, none of which were adequate to accommodate their family, with the exception

that Pam and Ron had recently secured a two-bedroom apartment. Diaz also expressed concerns about Pam's demonstrating appropriate behavior during visitation with the girls.

In November 2002, Crisman, Shannon and Stacey's therapist, provided an update as to the girls' progress, reporting that the girls had problems in reconciling the inconsistent information they had been given concerning the possibility of Pam's parental rights being terminated and the uncertainty of their future. However, Crisman testified at trial that overall, the girls had made improvements in their communication skills, had better self-esteem, and got along with each other much better. Crisman further testified that the girls would benefit if they had a consistent, safe environment to live in and that it would be in Shannon and Stacey's best interests to terminate Pam's parental rights. Crisman testified that the basis for her opinion is because the girls need closure and because Pam's prognosis was poor due to the fact that she has been unable to provide emotional stability, continues to use drugs, has chronic health problems, and does not have the capacity to effectively parent the girls.

At trial, Diaz testified that in her opinion, Pam had not made sufficient progress to have Shannon and Stacey returned to her and it was in the best interests of the girls to terminate Pam's parental rights. Diaz further testified that the Department has provided numerous services to Pam and that Pam has failed to comply or successfully complete any of the court orders with the exception of visitation.

Testimony was given at trial concerning Pam's past visitation with Shannon and Stacey and the possibility of continued contact between Pam and the girls in the future in the event that Pam's parental rights were terminated. Pam's visitation with the girls had been consistent and generally appropriate. The visitations were supervised and occurred primarily at public locations, such as the library, the park, and an eating establishment. The visits were semisupervised for a short period of time in the summer of 2002, whereby the visitation worker would provide the transportation but not stay during the visitation. This practice was discontinued and supervision was reinstituted due to Pam's telling the girls that she wanted to harm herself and the resulting concern for the emotional stability of the girls.

Shannon and Stacey each testified by deposition that they would like to continue to see Pam in the future in the event that they were not returned to her custody. The record reflects that efforts were being made to explore placement with a relative in Illinois and that the possibility of an open adoption was being discussed, whereby Pam would still be allowed some contact with the girls. Crisman testified that it would be in the best interests of Shannon and Stacey to maintain a relationship and have continued visitation with Pam, as long as the contact was supervised and monitored to ensure the emotional stability of the girls. Diaz agreed with Crisman that ongoing contact between Pam and the girls would be in the girls' best interests if the contact was "strictly" monitored. Diaz suggested, however, that the bond between the girls and Pam was perhaps an unhealthy one in that the girls have taken on the role of parent, feeling anxious about Pam's well-being and wanting to take care of her.

Pam also testified on her own behalf at trial. She admitted to a history of health problems, mental health issues, and chemical dependency problems, and she further admitted that she had not successfully completed a drug treatment program. In addition, despite Pam's belief that the group therapy she had participated in with Shannon and Stacey was beneficial, Pam admitted that she stopped attending those therapy sessions due to a disagreement she had had with the girls' counselor. Pam further testified that due to the extent of her numerous problems, she was not in a position to have Shannon and Stacey live with her, but she wanted to continue to be part of their lives. Pam stated that she would like to have Shannon and Stacey go to a "nice foster home" or adoptive home and that she would like to be able to exercise visitation with them.

In an order entered May 22, 2003, the separate juvenile court found Shannon and Stacey to be juveniles within the meaning of § 43-292(2), (6), and (7) and that it was in their best interests that Pam's parental rights be terminated. The court further denied Pam's motion for continued visitation for the reason that the court has no jurisdiction to order visitation once parental rights are terminated. Pam's motion for new trial was denied on June 9, and Pam timely appealed.

## ASSIGNMENTS OF ERROR

Pam alleges, reordered, that the separate juvenile court erred in (1) terminating Pam's parental rights and (2) finding that it did not have jurisdiction to order continued contact between Pam and the girls after Pam's parental rights were terminated despite evidence that demonstrated it would be in Shannon and Stacey's best interests.

## STANDARD OF REVIEW

In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003); *In re Interest of Heather G. et al.*, 12 Neb. App. 13, 664 N.W.2d 488 (2003).

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651 N.W.2d 231 (2002).

## ANALYSIS

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000); *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002). Only one ground for termination under § 43-292 need be proved in order to terminate parental rights. *In re Interest of Heather G. et al., supra.*

In the instant case, the juvenile court found that termination of Pam's parental rights was in the best interests of Shannon

and Stacey and that the State proved by clear and convincing evidence the grounds for termination specified in § 43-292(2), (6), and (7). Section 43-292(2) requires a finding that a parent has substantially and continuously or repeatedly neglected and refused to give the juvenile necessary parental care and protection. Section 43-292(6) requires a finding that following a determination that the juvenile is one as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family if required under Neb. Rev. Stat. § 43-283.01 (Reissue 1998), under the direction of the court, have failed to correct the conditions leading to the determination. And, § 43-292(7) requires a finding that the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months.

*Termination of Parental Rights Under § 43-292(7).*

The evidence adduced by the State at the termination hearing clearly shows that the termination of Pam's parental rights was proper according to § 43-292(7), which requires that the State prove that the juveniles have been in an out-of-home placement for 15 or more months of the most recent 22 months. Shannon and Stacey were removed from Pam on approximately July 7, 2000, and they had been in out-of-home placements continuously from that time up until November 27, 2002, the day the State filed its motion to terminate Pam's parental rights. Pam was provided more than "reasonable opportunities" to rehabilitate herself and failed to do so. See *In re Interest of Ty M. & Devon M.*, 265 Neb. at 169, 655 N.W.2d at 688. Therefore, based upon our de novo review of the record in this case, we conclude there is clear and convincing evidence that Shannon and Stacey have been in out-of-home placements for more than 15 months out of the last 22 months.

Having determined that the State has proved by clear and convincing evidence one of the grounds for termination of parental rights under § 43-292(7), we must next examine whether the State has also shown that termination of Pam's parental rights would be in the best interests of Shannon and Stacey.

*Best Interests.*

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory

grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Heather G. et al.*, 12 Neb. App. 13, 664 N.W.2d 488 (2003). A juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002).

At the time of the last termination hearing, Shannon and Stacey had been in foster care for approximately 3 years. It is clear from the record that Pam is unable or unwilling to rehabilitate herself. She has been given approximately 3 years to demonstrate that she is capable of caring for Shannon and Stacey without the presence of drugs in her life and has failed to do so. Pam has also failed to demonstrate that she can provide adequate, safe housing or that she can provide any type of stability, emotional or otherwise, for her family. The record further reflects numerous services that were made available to Pam that would have enabled her to regain custody of the girls. However, it is apparent that Pam has never been able to fully confront her addiction to drugs or commit to being sober and raising her family, as she conceded in her testimony at trial. While we recognize that Pam has a strong bond with Shannon and Stacey and that she consistently exercised her visitation rights over the past 3 years, even while incarcerated, this is certainly not enough to justify a reversal of the order to terminate Pam's parental rights. Therefore, we agree with the juvenile court that it is in Shannon and Stacey's best interests to terminate Pam's parental rights and allow the girls to obtain closure to what has been, at best, an unstable and chaotic life. This assignment of error is without merit.

*Jurisdiction to Order Visitation Subsequent to Termination.*

Pam also alleges that the separate juvenile court erred in finding that it did not have jurisdiction to order continued contact

between Pam and the girls after Pam's parental rights were terminated despite evidence that demonstrated it would be in Shannon and Stacey's best interests.

Clearly, once Pam's parental rights are terminated, she has no standing to assert entitlement to continued visitation with Shannon and Stacey. According to Neb. Rev. Stat. § 43-293 (Reissue 1998), "[a]n order terminating the parent-juvenile relationship shall divest the parent and juvenile of all legal rights, privileges, duties, and obligations with respect to each other . . . ." See, also, *In re Interest of Ditter*, 212 Neb. 855, 326 N.W.2d 675 (1982) (when parental rights of surviving parent have been terminated, that parent's parents lack standing to request visitation rights). However, the juvenile court continues to have jurisdiction over adjudicated children, either until their age of majority or until they become adopted, and until such time, the court has the authority to enter orders that are in the best interests of the children. See, § 43-247(3)(a) (jurisdiction of juvenile court); Neb. Rev. Stat. § 43-284 (Cum. Supp. 2002) (disposition orders); Neb. Rev. Stat. § 43-295 (Reissue 1998) (continuing jurisdiction to order changes in custody or care if in best interests of juvenile). Pam argues that this authority of the juvenile court extends to entering orders regarding continued contact between a parent and child after the termination of parental rights, so long as such request is made prior to the actual termination. We note that the issue of continued contact was addressed throughout the trial in this matter and was requested prior to the court's having entered its order terminating Pam's parental rights. We also note that the juvenile court, in denying the request for continued visitation, admitted that the evidence supported Pam's having continued contact with Shannon and Stacey. The court held that it lacked jurisdiction to enter such an order, even if it was in the best interests of the girls.

We agree with Pam that the juvenile court has authority, based upon its continuing jurisdiction over the children, to enter orders that are in the best interests of the children, including an order with respect to continued contact with a natural parent whose parental rights are being terminated. While we have found no cases which discuss this issue from the jurisdictional standpoint, the Nebraska Supreme Court has previously discussed the

request for visitation by a parent whose parental rights are being terminated pending appeal in *In re Interest of J.H. et al.*, 233 Neb. 338, 445 N.W.2d 599 (1989), and *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988). In both cases, the Supreme Court held that the record did not support granting visitation to the parent in question pending the appeal of the termination order. " 'After parental rights have been terminated, visitation while an appeal is pending would not be in the best interests of children who already have been in limbo for months or years.' " *In re Interest of J.H. et al.*, 233 Neb. at 350, 445 N.W.2d at 607, quoting *In re Interest of Z.D.D. and N.J.D., supra.* In *In re Interest of Z.D.D. and N.J.D., supra*, the father's parental rights were terminated, in part, under § 43-292(1) (Reissue 1984), based upon the county court's finding that the father had not seen his children for almost 10 months at the time the termination petition was filed and that such lack of contact, together with the other evidence of lack of support or contact, satisfied the abandonment requirement. In *In re Interest of J.H. et al., supra*, the evidence showed that the mother, whose parental rights were being terminated, had failed to consistently exercise visitation and had "vanished" for approximately 6 months, during which time she had no contact with the children.

The import of the above cases is that the Supreme Court based its decisions to affirm the denial of the request for post-termination visitation on the best interests of the children, not upon a lack of jurisdiction to consider the request. In both of the foregoing cases, the record clearly supported the denial of the request based upon the previous history between the parents and children with regard to visitation. In the present case, the record shows that Pam regularly exercised her visitation with Shannon and Stacey and that the visitations were generally appropriate and enjoyed by the girls. We are presented with the unusual situation in this case where the experts agree that continued contact between Pam and the girls, pending an adoptive placement, would be in the best interests of Shannon and Stacey.

We conclude that the juvenile court erred as a matter of law in determining that it lacked jurisdiction to consider Pam's request for continued visitation with Shannon and Stacey following the termination of Pam's parental rights. We hold that the

juvenile court retains continuing jurisdiction to enter orders, following the termination of a parent's parental rights, that are consistent with the best interests of the children, which orders may include providing for continued contact with a natural parent. While the juvenile court in this case recognized that the evidence supported continued contact between Pam and the girls, it did not make any specific findings with regard to the best interests of Shannon and Stacey and, of course, did not address the type of contact or visitation that should occur in this case. Therefore, we reverse that part of the order of the juvenile court denying the motion for continued visitation and remand the cause for further proceedings consistent with this opinion.

## CONCLUSION

Based upon our de novo review of the record, we conclude that the State has proved by clear and convincing evidence that Shannon and Stacey have been in out-of-home placements for more than 15 months out of the last 22 months. We also conclude that termination of Pam's parental rights is in the best interests of Shannon and Stacey. We further conclude that the juvenile court erred in determining that it lacked jurisdiction to consider Pam's request for continued visitation following the termination of her parental rights. Accordingly, we affirm in part, and in part reverse and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.