IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF DAYTON C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DAYTON C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
JOHN C., APPELLANT.

Filed October 15, 2013.    No. A-13-201.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Paul M. Muia, of Law Offices of Paul Muia, for appellant.

Donald W. Kleine, Douglas County Attorney, Amy N. Schuchman, and Patrick C. McGee, Senior Certified Law Student, for appellee.

INBODY, Chief Judge, and IRWIN and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

John C. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his son, Dayton C. Because we find that the State proved by clear and convincing evidence a statutory ground for termination and that termination of John's parental rights was in Dayton's best interests, we affirm.

## BACKGROUND

John is the biological father of Dayton, born in June 2007. When Dayton was approximately 2 years old, his maternal grandparents were granted a legal guardianship of him. The guardianship was terminated on April 13, 2011, and Dayton was returned to his mother's

- 1 -

care. Later that month, Dayton was removed from his mother's care and placed in the custody of the Department of Health and Human Services (DHHS).

On July 31, 2012, the State filed a supplemental petition alleging that Dayton was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of John. The State also asked that the court terminate John's parental rights to Dayton pursuant to Neb. Rev. Stat. § 43-292(1), (2), (7), and (9) (Cum. Supp. 2012). On August 13, the juvenile court found that Dayton was a child within the meaning of § 43-247(3)(a) as to John, because John was incarcerated, and Dayton was ordered to remain in the custody of DHHS.

The State also filed a motion to terminate the parental rights of Dayton's mother, which the juvenile court ultimately granted. Because she has not appealed that decision, we will not address her any further or discuss any evidence presented as to her at the termination hearing.

The termination hearing was held on November 26, 2012, and February 15, 2013. The following evidence was presented: Dayton's maternal grandmother, Ivy G., is currently acting as his foster mother, and prior to that, she had been his legal guardian since he was 2 years old. Dayton lives with Ivy during the week, and on the weekends for the past 3 years, he has lived with Susan D., who is John's mother and Dayton's paternal grandmother. The grandmothers arranged this schedule informally, and John is aware of the arrangement.

Ivy testified that John never comes to her house to visit Dayton or calls to ask about him or speak to him. John has never sent any cards, gifts, letters, or financial support for Dayton to her home. Susan testified that John would call her house to talk to Dayton, but over the past 3 years that Dayton has lived with her on the weekends, John has never been consistent in visiting Dayton. She described John's visits with Dayton as "sporadic" and said that he would generally see Dayton about once every 2 or 3 weeks, but it "[w]asn't anything that was on a normal basis." Susan stated that there were times she arranged for John to come to her house to visit Dayton, but that John did not show up for the visits. In fact, the two most recent times she had arranged for John to see Dayton, he had not shown up, including on Thanksgiving.

John has been incarcerated off and on for a number of years, including from September 2011 until January 2012. Chelsey Sprague, the DHHS family permanency specialist for Dayton from December 2011 until December 2012, testified that she visited John in jail in January 2012. She introduced herself to John, told him why Dayton was in DHHS' custody, and asked if he was willing to participate in any services provided by DHHS upon his release. John indicated that he was willing to participate, so Sprague asked him to contact her when he was released so she could assist John. John was not offered any services by DHHS at that time because he was incarcerated, and he did not take advantage of any services offered by the correctional facility while incarcerated.

John contacted Sprague when he was released later that month. Sprague asked him to call her back with his housing information so she could set up visitation with Dayton. John never provided this information to Sprague, and she testified that John's contact with her while he was not incarcerated was sporadic, she did not always know where he was living, and she did not always have a contact telephone number for him.

Sprague sent certified letters to John in February, May, and December 2012, informing him that Dayton was a state ward, but John never intervened in the court proceedings. John was reincarcerated sometime between January and June 2012, although the record is unclear as to

when. In June, John asked Sprague to visit him at the correctional facility where he was housed. When she visited him on June 19, John admitted that he knew Dayton was in foster care, but he never asked Sprague for visitation or contact with Dayton. During the time that Sprague worked on this case, John never paid any child support for Dayton.

John was released from incarceration in October 2012 but reincarcerated in January 2013. He remained incarcerated throughout the termination hearing.

Sprague was asked for her opinion as to whether terminating John's parental rights would be in Dayton's best interests. She stated that she believed it would be and that Dayton would be at risk for harm if he was placed in John's care. The basis for Sprague's opinion was John's lack of involvement in Dayton's life and her belief that John's multiple incarcerations show that he is not able to provide stable housing, provide a stable source of income, or provide for Dayton's needs.

The juvenile court subsequently entered an order finding that the State proved all of the grounds alleged in the supplemental petition by clear and convincing evidence and that termination of John's parental rights was in Dayton's best interests. John timely appeals.

## ASSIGNMENTS OF ERROR

John assigns, summarized and renumbered, that the juvenile court erred in finding that the State proved by clear and convincing evidence that John's parental rights should be terminated under § 43-292(1), (2), (7), and (9) and in finding that the State proved by clear and convincing evidence that termination of John's parental rights was in the best interests of Dayton.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches conclusions independently of the juvenile court's findings. *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

## ANALYSIS

*Grounds for Termination.*

The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating John's parental rights to Dayton, the juvenile court found that the State had proved four of the conditions contained in § 43-292 by clear and convincing evidence, namely subsections (1), (2), (7), and (9). Upon our de novo review, we find that the evidence clearly and convincingly established that Dayton was in an out-of-home placement for at least 15 of the most recent 22 months, pursuant to § 43-292(7).

Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does

not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

This court has previously described the proper application of § 43-292(7) as follows:

The proper application of this subsection consists of counting the most recent 22 months preceding the filing of the petition to terminate parental rights, followed by counting how many of those 22 months the child was in out-of-home placement. If the child was in out-of-home placement for 15 of those 22 months, the statutory grounds for termination of parental rights are satisfied and termination of parental rights is appropriate, subject to a determination that such termination is in the child's best interests.

*In re Interest of Kindra S.*, 14 Neb. App. 202, 210, 705 N.W.2d 792, 801 (2005). The petition to termination John's parental rights was filed on July 31, 2012. Dayton did not reside with John during any of the 22 months prior to July 2012. Accordingly, there is clear and convincing evidence that termination of John's parental rights was appropriate pursuant to § 43-292(7).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, this court need not review termination under § 43-292(1), (2), or (9). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

*Dayton's Best Interests.*

John argues that the juvenile court erred in finding that terminating his parental rights was in Dayton's best interests. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Therefore, with such severe and final consequences, parental rights should be terminated only "'[i]n the absence of any reasonable alternative and as the last resort . . . .'" See *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 467, 598 N.W.2d 729, 741 (1999). However,

[w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002).

*In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 717, 684 N.W.2d 594, 602 (2004).

There was no evidence presented that John has ever cared for Dayton on a full-time basis, and in fact, Dayton has been raised almost exclusively by his grandmothers since he was 2 years old. Ivy first acted as Dayton's legal guardian and then became his foster mother. According to her, John never comes to visit Dayton at her house or calls to ask about him or speak to him. John has never sent any cards, gifts, letters, or financial support for Dayton. For the last 3 years

that Susan has cared for Dayton on the weekends, John would call to talk to Dayton on occasion and visit sporadically when not incarcerated.

John was incarcerated more often than not during the time Dayton was in the custody of DHHS. He knew that Dayton was a state ward, but he never attempted to intervene in the court proceedings or asked Sprague to set up formal visits with Dayton. John did not participate in any services available to him while at the correctional facility. And while he indicated a willingness to participate in services offered by DHHS upon his release, John never followed through with providing information to Sprague in order to begin services or set up visitation with Dayton. Notably, even when John was not incarcerated, he made only a minimal and inconsistent effort to visit Dayton and never provided any financial support for him.

The Nebraska Supreme Court has noted that in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). John has never provided Dayton with necessary parental care and protection because John has been incarcerated off and on throughout Dayton's entire life. As a result of John's repeated incarceration, he simply has been unable to provide Dayton with such basic necessities as housing and food. In addition, John has not been able to tend to Dayton's daily needs or to provide any emotional support. At the conclusion of the termination hearing, Dayton was 5½ years old and had never resided in his father's home.

Sprague opined that Dayton would be at risk for harm if he was returned to John's care and that it would be in Dayton's best interests if John's parental rights were terminated. She based this opinion on John's lack of involvement in Dayton's life and John's multiple incarcerations, which show that he is unable to provide stability for Dayton.

In our de novo review of the record, we find that it is in Dayton's best interests that John's parental rights be terminated.

CONCLUSION

Based on the foregoing reasons, we affirm the decision of the juvenile court terminating John's parental rights to Dayton.

AFFIRMED.