IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF GABRIELLE Z. & LILLIAN Z.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GABRIELLE Z. & LILLIAN Z., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
CRYSTAL Z., APPELLANT.

Filed January 7, 2014.    No. A-13-357.

Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

Norman Langemach for appellant.

Alicia Henderson, Chief Deputy Lancaster County Attorney, and Amy Clemens, Senior Certified Law Student, for appellee.

IRWIN, PIRTLE, and BISHOP, Judges.

BISHOP, Judge.

Crystal Z. appeals from the order of the separate juvenile court of Lancaster County terminating her parental rights to her children, Gabrielle Z. and Lillian Z. We affirm.

BACKGROUND

Lillian, born in March 2006, and Gabrielle, born in February 2010, are the natural children of Crystal and Jonathan Z. Crystal has another child, Emberlynn S., born in January 2012. Neither Emberlynn nor her father, Matthew S., were part of these proceedings or this appeal.

The State's involvement with this family began in July 2008, when the Nebraska Department of Health and Human Services (DHHS) received a report regarding unsanitary living conditions. DHHS visited the home and noted significant clutter, boxes stacked to the ceiling, and a strong scent of urine. There were also concerns of a roach infestation. Parenting concerns

were addressed at this time as well, including lack of redirection of Lillian (age 2 at the time) when she misbehaved or was climbing or jumping on things, as well as some nutrition issues. DHHS worked with the family on a voluntary basis, and the case was closed in July 2009.

Less than 1 year later, in May 2010, Gabrielle, who was 3 months old at the time, was discovered to have a skull fracture, a bruise under her eye, and four healing rib fractures. Lillian had bruising on her forearms, underarm area, and left hamstring area. Gabrielle and Lillian were placed in the temporary custody of DHHS, which placed them in foster care. The children have been in the custody of DHHS continuously since that time. It was later learned that Jonathan may have caused some of Gabrielle's injuries while Crystal was at work. Jonathan admitted to causing Gabrielle's skull fracture. He is currently incarcerated in relation to the incident.

In June 2010, Gabrielle sustained a severe, second degree sunburn to her face while on a supervised visit with Crystal. The visit was supervised by Gabrielle's foster parents, who were relatives of Crystal. Lillian and Gabrielle were removed from that foster home and placed with Trisha J. Crystal pled no contest to child abuse/neglect in relation to the incident, but her sentence is not apparent from our record.

Lillian and Gabrielle were adjudicated in August 2010 due to the faults or habits of Crystal. They were adjudicated due to the faults or habits of Jonathan at a later date.

Several review and permanency hearings were held between 2010 and 2012; not all of the evidence from these proceedings appears in our record. Crystal was provided with numerous services, including a pretreatment assessment, a psychological assessment, a psychiatric evaluation, a parenting assessment, individual therapy, family therapy, family support, a parent partner, and supervised visitation. Crystal participated in all services. Although DHHS recommended monitored visits in June and October 2011, the juvenile court ordered that the visits remain fully supervised, presumably due to ongoing safety concerns, and by October 2011, Crystal was in the latter stage of her pregnancy with Emberlynn.

On March 30, 2012, the State filed a motion to terminate Crystal's parental rights to Lillian and Gabrielle pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2012). The State alleged that Crystal had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection, reasonable efforts had failed to correct the conditions leading to the adjudication, the children had been in an out-of-home placement for 15 or more of the most recent 22 months, and termination was in the children's best interests.

The State also moved to terminate Jonathan's parental rights to Lillian and Gabrielle. Jonathan subsequently relinquished his parental rights to Lillian and Gabrielle. Jonathan is not part of this appeal.

The termination hearing was held in February and March 2013. Testimony was given regarding Crystal's progress throughout this case.

Sabina Hardesty was the case manager services coordinator and family permanency specialist on this case. She worked with this family from November 2010 until February 2013, at which time she was released from her employment at DHHS for matters not pertinent to this appeal. Hardesty testified regarding safety concerns with Crystal. Hardesty stated that Crystal would not admit that Jonathan was partially responsible for Gabrielle's and Lillian's injuries. According to Hardesty, in February 2011, Crystal asked if Lillian could talk to Jonathan on the

telephone. When Hardesty told her that would not be appropriate, Crystal indicated that it was not known if Jonathan injured the children. During that same time, Crystal was still visiting Jonathan in prison and was his "payee" for disability and managed his money. When Hardesty told Crystal that her involvement with Jonathan was a concern, Crystal stopped being his payee and filed for divorce. The divorce was finalized in July 2011. Hardesty spoke with Crystal again in the fall of 2011 regarding Gabrielle's skull and rib fractures, in the context of finding appropriate caregivers. Crystal said that she had to work, so "'what did I expect her to do.'" When Hardesty told Crystal that "we need to find someone safe to leave our kids with," Crystal responded that "life is a safety concern."

Hardesty testified that in June 2011, despite some ongoing safety concerns, she recommended monitored visits, but the court disagreed and the visits remained supervised. She testified that in July, the visitation notes state that Gabrielle was playing with a plastic bag, scissors, and trying to plug a cord into an outlet. Those safety concerns were discussed with Crystal at the July team meeting, and were no longer an issue after that meeting. In October, Hardesty again initially recommended monitored visits, but the hearing had to be continued into December and then February 2012 to accommodate the court's schedule and to get to all witnesses. By February 2012, Hardesty had changed her position about visits and was recommending supervised visitation. From that point forward, Hardesty was unable to recommend moving to monitored visitation because Crystal, without redirection, was not able to "identify when the children are at risk" and react appropriately and in a timely manner. Hardesty stated, "I did not feel that the kids could be -- would be safe without a supervised worker in [Crystal's] home."

Hardesty testified that in May 2012, in response to a breakup with Matthew (Emberlynn's father), Crystal slit her wrists, sent suicidal text messages to family members, and was admitted into a crisis center. Hardesty said that Crystal denied slitting her wrists, saying instead that she had an allergic reaction to some perfume and had scratched her wrists.

Hardesty gave examples of other parenting and safety concerns. In July 2012, Crystal told Lillian (age 6 at the time) that "maybe you are pregnant" when Lillian complained that her stomach hurt. Also in July, there were two occasions when Crystal asked the visitation worker to watch either Emberlynn or the other two girls so that Crystal could cook or give a bath to a child. In August, Crystal did not notice that Gabrielle had a book of matches until the visitation worker told her. In that same month, the visitation worker had to point out to Crystal that Gabrielle was positioned in such a way that she might fall off a chair. Hardesty testified that there is a continuing need to redirect Crystal during visits and that there seems to be a "disconnect" on what she needs to do to keep the children safe. Hardesty also testified to an apparent disconnect with Crystal's interest in the children. In September, when Hardesty learned that Trisha (foster mother) was improperly influencing the children against Crystal, Hardesty placed the children in respite (a temporary, familiar location). When Hardesty told Crystal that she had discovered concerns with Trisha and that the children were going to be in respite while that was investigated, Crystal's response was, "'Can I go to lunch with Lillian?'" Hardesty testified that Crystal did not ask about what had happened, nor did she ask if the girls were okay or with whom they were placed. Hardesty noted that Crystal can respond appropriately when asked about hypothetical situations, but does not respond when the situation actually arises. Hardesty

acknowledged that the visitation notes usually indicate "no safety concerns," but stated that not all safety concerns are noted in the reports even though they are discussed with Crystal.

Stephanie Meyer is a licensed independent mental health practitioner and a certified professional counselor. She began working with Lillian in March 2012 and was aware at that time that the State was considering termination.

Meyer testified that in August 2012, partly in response to a call from Crystal, she began investigating the effect Trisha (foster mother) was having on Lillian. After learning that Trisha was telling Lillian things like "your mom doesn't love you" and "you don't have to listen to your mom," Meyer recommended changing the foster placement. Lillian and Gabrielle were then placed with Shawn V., and the children have been with her since that time.

Meyer testified that Crystal did a good job of calling weekly to discuss what she was seeing with Lillian and that Meyer gave her ideas on things to do on visits. Meyer began to involve Crystal in family therapy sessions after a January 2013 court hearing because Hardesty told Meyer to do so. Crystal was allowed to participate in two sessions, one in January and the second either in late January or early February. Meyer testified that during the second session, Crystal told the girls that she was proud of them and loved them, but Crystal did not talk about the girls' feelings of sadness or fear. Meyer also talked to Crystal about permanency and what she would do differently if she got her children back, and Crystal indicated that nothing was her fault and that she had done everything correctly the entire time. Because Meyer did not see a benefit to continuing family therapy without knowing what the outcome of the case would be, she informed Crystal that there would be no more family sessions until the termination case was resolved.

Meyer diagnosed Lillian with reactive attachment disorder (RAD) and said Lillian is "one of my more severe cases that I've seen." Meyer testified that RAD is a disorder that comes from environmental causes and begins in infancy. Meyer testified that RAD is caused by a caregiver not meeting the needs of the child or picking up on the cues of the child (e.g., changing the child's diaper when the child is actually hungry, not holding the baby when the baby needs to be held, or overfeeding or underfeeding the baby), which will then cause the child to learn to mistrust the world or to mistrust themselves. A child with RAD lacks the ability to connect with feelings, is unable to bond with others, has symptoms of attention deficit hyperactivity disorder, and has no "stranger danger." Meyer testified that as RAD progresses, it can turn dangerous, "like you'll see a lot of aggressive gesturing, fire setting, cruelty to animals[,] [e]ven murder." Meyer testified that Lillian is already becoming more aggressive, threatening, and dangerous. Meyer testified that Lillian had hurt children at school, had made stabbing motions toward Gabrielle, and had tried to smother her foster mother Shawn with a pillow. According to Meyer, Lillian needs a lot of supervision.

Meyer testified that in order to treat Lillian, Meyer needs to know who Lillian's primary caregiver will be so that she can work with the two of them in family therapy. Meyer testified that it would be harmful to do family therapy with someone who is not going to be a permanent caregiver for Lillian, because RAD therapy involves working on establishing bonds, and if the caregiver changes, it results in one more broken bond for the child. Meyer testified that Lillian's prognosis could be good if she is placed in a stable, long-term environment. Meyer stated that it is "imperative" to begin family therapy as soon as possible.

Dr. Judith Bothern, a clinical psychologist, did a psychological evaluation and parenting assessment of Crystal in August 2012. Dr. Bothern diagnosed Crystal with a dependent personality disorder. Despite the diagnosis, Dr. Bothern thinks that Crystal can be an adequate parent.

As part of the process, Dr. Bothern reviewed all of the case records, including all visitation reports, and met with Crystal and the children. During two home visits (totaling 3 hours 15 minutes) in August 2012, Dr. Bothern observed Crystal interacting appropriately with the girls and being attentive to their needs.

Dr. Bothern's 37-page report was received into evidence without objection. In her report she noted:

> This examiner reviewed all visitation notes and monthly summaries for a total of 58 documents . . . . Of those notes, 51 had 18 areas that could be rated for each visit . . . . There were also 7 monthly summaries that provided between 3 and 5 areas that could be rated . . . .
> Each area could be rated at one of 3 levels. Those levels were as follows:
> Inconsistent/improvement needed
> Baseline/Adequate
> Effective application/clear strength
> Of 834 data points from these documents, the results were as follows:
> Inconsistent/improvement needed: 4%
> Baseline/Adequate: 81%
> Effective application/clear strength: 15%
> Clearly from visitation documentation provided to this examiner, Crystal has been meeting or exceeding expectations in 96% of all visits from 9/28/11 through 8/13/12.

Dr. Bothern testified that her review of the record revealed that transitioning Crystal from supervised to monitored visits had been recommended numerous times. Specifically, Dr. Bothern points to a parenting assessment completed by a Dr. Pilkington in January 2011, a June 2011 DHHS permanency planning report, and four monthly summaries in which the family partner would have supported the decision to move to monitored visits (August 2011, September 2011, October 2011, and January 2012). Dr. Pilkington's parenting assessment recommended that "the court consider lengthening the time Crystal is with her daughters and consider monitored versus supervised visits in her home, followed by monitored overnight visits once Crystal has demonstrated competent parenting skills and her daughters are responding well to this increased contact." Dr. Bothern noted that the court-appointed special advocate and others also supported reunification.

Dr. Bothern testified that in her opinion, Crystal "is performing adequately and can at least at a minimum, adequately parent her children." Dr. Bothern did not see a reason why Crystal should not be reunited with her children; however, during trial, she stated that her conclusion would have been different if there was conclusive proof that Crystal caused Gabrielle's rib injuries.

Shane Crockett, a licensed independent mental health practitioner, worked with Crystal weekly from May 2010 through August 2012. Crockett worked with Crystal on parenting skills

regarding safety concerns. Crockett successfully discharged Crystal in August because she had reached "maximum benefit" and was able to "verbalize and express everything back that we would talk about on how to handle situations." When presented with exhibit 65, a list of parenting concerns through January 2013, Crockett indicated the concerns were the same kinds of things Crystal had worked on in therapy prior to discharge.

Julie Zeggers, a supervisor for child and family services at DHHS, began supervising this case in November 2010. She testified that the recurring themes in this case include a lack of supervision, nutritional concerns, Crystal's becoming emotional or easily frustrated in front of the children, and Crystal's not recognizing safety concerns or necessary parenting techniques on her own. Zeggers is also concerned that Crystal is not able to handle all three children at the same time. Zeggers stated that specific safety incidents could happen in anyone's home, but that in this case, the concern is that it is a pattern and not a one-time incident.

Zeggers testified that Crystal has been cooperative with services. She also acknowledged recent evaluations indicating that DHHS should move to monitored visitation. Zeggers testified that she is not recommending lower level supervision because there are continued safety concerns on supervised visits and continued assistance from family partners to care for the children. Zeggers could not think of any other services that could be provided to help Crystal become a proactive parent. Zeggers testified that Crystal's parental rights should be terminated because of the continued safety concerns and because the girls have been out-of-home for several years and need permanency.

Amber Bednar, a family partner who had supervised Crystal's visitations two times per week since August 2012, testified that in December 2012, Crystal took the girls to a park to have professional pictures taken. It was not until after the pictures that Bednar learned that one of the women taking the pictures was Crystal's sister, who was not approved to be present at visits. Bednar testified that there was an ongoing issue with Crystal's giving ranch dressing to the girls even though Lillian and Gabrielle are allergic to it (they get a rash on their face). Bednar also testified that on one occasion, Crystal used a bobby pin to clean the girls' ears. According to Bednar, Crystal needs to work on following through with discipline.

Melissa Stolley, a family partner who had supervised Crystal's visitations once a week since the end of November 2012, testified that the biggest thing for Crystal to work on is the bathtime routine, which is always a struggle. She also noted that Crystal raises her voice when frustrated and that there have been times when Lillian asks Crystal not to yell at her.

Although Carrie Gottschalk did not testify, her "Parent-Child Relationship Assessment Report" was received into evidence without objections. In her December 2012 report, Gottschalk, a licensed mental health professional, noted that the evaluation was performed on a referral from DHHS. Gottschalk's report was based on her review of case records, two interviews with Crystal, and one assessment between Crystal and each of the girls separately. Gottschalk stated that Crystal had met or exceeded all of the court's requirements in an effort to regain custody of her children. She also stated that there had been no reports of serious safety concerns since 2010. Gottschalk stated that "Crystal demonstrates an ability to have an adapted parent-child relationship with each of the children. She remained attuned, engaging, and positive throughout each assessment. Each of her children demonstrated an appropriate level of comfort toward Crystal." In the "recommendations" section of the report, Gottschalk wrote:

Permanency, safety, and stability are of utmost concern for [both] of these children. At the date of this report Lillian and Gabrielle have remained in an out-of-home placement for 31 months . . . . It is recommended that visitation time be increased, moved to monitored visits, and then to overnight visits. Barring the report of significant incidents, reunification should be completed as quickly as possible and is in the best interest of the children.

Crystal testified that she divorced Jonathan to get away from him. She knows that Jonathan caused Gabrielle's skull fracture, but she does not know the circumstances or if it was intentional. Crystal said that she is now divorced from Jonathan and does not talk to him. She testified that the day Gabrielle was sunburned, sunscreen had been reapplied periodically, but that Gabrielle burned anyway. Since that incident, Crystal always carries sunscreen.

Crystal responded to various safety concerns raised about her. She said that on the occasion she used a bobby pin to clean the girls' ears, it was because the infant ear cleaner she had was broken and that the bobby pin was the only thing she had which was similar in design to the infant cleaner. She said that the girls know to sit very still while she cleans their ears and that she just goes around the edge of the opening to the ear canal to remove the girls' excess wax. Crystal stated that she cannot use a "Q-tip" because that pushes the wax back into the canal.

Crystal testified that when she took the girls for pictures in December 2012, she did not know that her sister would be there; Crystal thought her sister's business partner would be the one taking pictures. Crystal admitted that when she saw her sister at the park, she did not tell the visitation worker, despite knowing that her sister was not approved to be at visits. Crystal's sister was subsequently approved for visits.

In its order filed on March 29, 2013, the juvenile court terminated Crystal's parental rights to Lillian and Gabrielle pursuant to § 43-292(2), (6), and (7) and found that termination was in the children's best interests. The court relied on the ongoing safety concerns in reaching its best interests determination. The juvenile court discounted Dr. Bothern's testimony that she did not see anything in the documents to support the assertion that Crystal needed to be redirected or cued to safety concerns, because such testimony was "just not supported by the years of evidence" showing otherwise. Crystal has timely appealed the juvenile court's termination of her parental rights.

## ASSIGNMENTS OF ERROR

Crystal assigns that the juvenile court erred in finding (1) that her parental rights should be terminated and (2) that the evidence was sufficient to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Candice H.*, 284 Neb. 935, 824 N.W.2d 34 (2012).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Crystal's parental rights to Lillian and Gabrielle, the juvenile court found that Crystal substantially and continuously neglected to give the children necessary parental care and protection (§ 43-292(2)), reasonable efforts failed to correct the condition which led to the adjudication (§ 43-292(6)), and the children had been in an out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Crystal does not contest the juvenile court's finding that grounds for terminating her parental rights exist. And having reviewed the record, we find that grounds did exist. Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Lillian and Gabrielle were removed from parental care in May 2010. At the time the motion to terminate parental rights was filed on March 30, 2012, Lillian and Gabrielle had been in an out-of-home placement for 22 months. And at the time the termination hearing began in February 2013, the children had been in an out-of-home placement for 33 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Crystal's parental rights under § 43-292(7) were proved by sufficient evidence. Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Crystal argues that the juvenile court erred in finding that terminating her parental rights was in the best interests of Lillian and Gabrielle. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Therefore, with such severe and final consequences, parental rights should be terminated only "in the absence of any reasonable alternative and as the last resort." See *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 467, 598 N.W.2d 729, 741 (1999). However,

> [w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Phyllisa B.*, 265 Neb. 53, 654 N.W.2d 738 (2002).

*In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 717, 684 N.W.2d 594, 602 (2004).

Very serious circumstances brought this case before the juvenile court. Jonathan admitted to causing Gabrielle's skull fracture and is now incarcerated. The cause of Gabrielle's rib fractures and the bruising on both girls is still unknown. Gabrielle was in Crystal's care when she

was severely sunburned. We recognize that since 2010, Crystal has been cooperative and has done everything that has been asked of her. She has completed a pretreatment assessment, a psychological assessment, a psychiatric evaluation, a parenting assessment, and individual therapy. She has participated in family therapy, worked with a parent partner, and attended all supervised visitations. Despite all of the services provided to her, Crystal has failed to move beyond supervised visitation because of ongoing safety concerns.

The State's case for terminating Crystal's parental rights was based on continued safety concerns and the girls' need for permanency. Exhibit 65 is a 22-page summary of the parenting concerns taken from the February 2012 through January 2013 visitation records. Some of the reoccurring concerns included the following: Crystal's not noticing that the children had access to choking hazards, such as water bottle caps; Crystal's allowing the girls to eat ranch dressing even though they were allergic to it; Crystal's becoming frustrated with the girls; visitation workers' having to remind Crystal to wash her hands after changing a diaper and before preparing dinner; Crystal's relying on the visitation workers to help care for the children; and Crystal's not checking on the girls while they were playing alone in their bedroom. "The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *In re Interest of Jacob H. et al.*, 20 Neb. App. 680, 692, 831 N.W.2d 347, 356 (2013). In this case, there is an overall lack of improvement in Crystal's parenting skills despite her participation in numerous services made available to her.

We acknowledge that there are discrepancies within the visitation records regarding Crystal's performance. The visitation reports from each visit contain a chart showing numerous areas to be rated for each visit, and these charts, as analyzed by Dr. Bothern, do not by themselves indicate inadequate parenting. We recognize that the majority of the time, Crystal received baseline/adequate ratings for safety of the environment when looking only at the boxes checked on these forms. However, the narrative portions of the records tell a different story and are more persuasive, especially when combined with witness testimony. We would note that if documentation such as this is going to be offered and received as evidence in a proceeding of this importance, its usefulness will depend on the credibility of the data reported. When the narrative portions are not consistent with other parts of the document, it is left to a factfinder to determine which parts, if any, are more consistent with other evidence presented at trial. Greater attention to accuracy and consistency by those individuals completing such reports is strongly recommended so that they can be a more valuable aid to both the parent(s) and the court in juvenile court proceedings.

The visitation records as a whole reveal that Crystal struggles to parent all three children at the same time (Emberlynn is always present for visits with Lillian and Gabrielle). Crystal routinely relies on the visitation worker to assist her with the children. Crystal is not actively engaged with the children; she is often texting rather than supervising her children. Crystal's inability to maintain focus on the children and provide proper supervision is concerning, especially with regard to Lillian who, according to Meyer, is already exhibiting aggressive, threatening, and dangerous behaviors and needs a lot of supervision. Although Crystal has cooperated in many of the services made available to her, the juvenile court concluded that Crystal has "simply failed to demonstrate by her actions that she has internalized anything that

she has been taught"; that the children "deserve to receive permanency in a safe, stable, and loving home"; and that "[t]here are no present indicators that [Crystal] will be able to provide this to them now or in the foreseeable future." We agree.

Lillian and Gabrielle have been out-of-home since May 2010. Some experts argue for monitored visitation and reunification while other experts say that ongoing safety concerns prevent reunification. Those arguing for reunification have spent relatively little time actually observing Crystal with the girls, and in the case of Dr. Pilkington, her observations were made 2 years prior to the termination hearing. As noted by the juvenile court, Dr. Bothern's testimony that she did not see anything in the documents to support the assertion that Crystal needed to be redirected or cued to safety concerns is "just not supported by the years of evidence" showing otherwise. And Gottschalk's report was based in part on Dr. Bothern's evaluation.

While the experts seem to disagree on termination, they all agree that the children need permanency. This is particularly true for Lillian. According to Meyer, Lillian has RAD, but her prognosis could be good if she is placed in a stable, long-term environment. Crystal has never moved beyond supervised visitation because of ongoing safety concerns. Crystal may be able to respond appropriately when asked about hypothetical situations, but she does not, or cannot, respond when the situation actually arises. When asked what she would do differently if she got her children back, Crystal indicated that nothing was her fault and that she has done everything correctly the entire time. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002).

At the time of the termination hearing, the children had already been in an out-of-home placement for 33 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Crystal is an unfit parent. Therefore, after our de novo review, we find that it is in the children's best interests that Crystal's parental rights be terminated.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Crystal's parental rights to Lillian and Gabrielle.

AFFIRMED.