IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KENTRELL W.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KENTRELL W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KENNETH W., APPELLANT.


Filed June 16, 2020.    No. A-19-956.


Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

John J. Ekeh for appellant.

Kati M. Kilcoin, Deputy Douglas County Attorney, and Katherine Corwin, Senior Certified Law Student, for appellee State of Nebraska.

Shurie R. Graeve, of Graeve Law & Mediation, L.L.C., guardian ad litem.


MOORE, Chief Judge, and RIEDMANN and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Kenneth W. appeals from an order of the separate juvenile court of Douglas County terminating his parental rights to his son, Kentrell W. On appeal, Kenneth challenges the court's findings that termination of his parental rights was warranted under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination is in Kentrell's best interests. Kenneth also challenges the court's order denying him posttermination visitation rights during the appeal's pendency. For the reasons that follow, we affirm the juvenile court's decision to terminate

- 1 -

Kenneth's parental rights. However, we reverse and remand the issue of posttermination visitation rights to the juvenile court for further proceedings.

BACKGROUND

On July 18, 2017, the State filed a supplemental petition alleging that Kentrell was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care due to Kenneth's fault or habits. The State alleged that Kenneth engaged in domestic violence and used alcohol, drugs, and/or controlled substances, which placed Kentrell at risk for harm. On the same date, the State filed an ex parte motion for immediate custody, to which an affidavit of a specialist from the Department of Health and Human Services (the Department) was attached. In the affidavit, the specialist stated that Kentrell had been brought to the Department's attention on July 13 while he was living in his mother's home. According to the specialist's affidavit, she spoke with Kentrell's mother, who stated that she had withdrawn domestic violence allegations against Kenneth after he called her some 80 times while incarcerated from January through March 2017. Kentrell's mother reported that Kenneth had spent a lot of time at her home since his release and continued assaulting her during that time. The specialist opined in her affidavit that placement of Kentrell into temporary foster care was a matter of immediate and urgent necessity for his protection and safety. The court entered an ex parte order for immediate temporary custody on July 18, placing Kentrell in the custody of the Department and excluding Kenneth's home as a possible physical placement. We note that Kentrell's mother has relinquished her parental rights. She will only be mentioned as necessary to the issues relevant to Kenneth.

On August 16, 2017, the State filed an "Amended Supplemental Petition and Termination of Parental Rights." The State alleged three counts against Kenneth. First, the State alleged that Kentrell was a juvenile within the meaning of § 43-247(3)(a) because Kenneth's use of alcohol and/or controlled substances placed Kentrell at risk for harm; Kenneth failed to provide proper parental care, support, supervision, and/or protection of Kentrell; and Kenneth engaged in domestic violence against Kentrell's mother. The State further asserted that Kenneth had been provided domestic violence classes and case management under a previous now-closed abuse/neglect case but was unable to make substantial lifestyle changes to safely parent Kentrell. The second count alleged that Kenneth's parental rights ought to be terminated under § 43-292(2) because he had substantially and continuously or repeatedly neglected and refused to give Kentrell necessary parental care and protection. In the third count, the State alleged that termination of Kenneth's parental rights was in Kentrell's best interests.

The State filed a motion to dismiss the second and third counts of the amended supplemental petition and termination of parental rights on December 12, 2017. The court granted the State's motion to dismiss on the same date.

On January 8, 2018, an adjudication hearing was held, but a transcript of the hearing does not appear in our record on appeal. The court found that the State had not proved that Kenneth's use of alcohol and/or controlled substances placed Kentrell at risk of harm and had not proved that he engaged in domestic violence with Kentrell's mother. However, the court determined that the State had proved that Kenneth failed to provide proper parental care, support, supervision, and/or

protection for Kentrell, which failure placed Kentrell at risk for harm. Accordingly, the court adjudicated Kentrell as a juvenile within the meaning of § 43-247(3)(a) and ordered that he remain in the temporary custody of the Department.

A continued disposition hearing was held on March 12, 2018. The court found that reasonable efforts had been made to return Kentrell to a parental home, that those efforts had not succeeded, and that it would therefore be contrary to his health, safety, and welfare to be returned to the parental home at that time. The court ordered Kenneth to complete nine specific directives:

(1) Obtain and maintain safe, stable, and adequate housing and provide proof to the case manager;

(2) Obtain and maintain a legal, stable source of income and provide proof to the case manager;

(3) Within 24 hours, complete a budget (and timely supplements) to assist with timely determination of ability to pay for services/treatment ordered by the court;

(4) Complete a parenting program by June 1, 2018;

(5) Attend medical appointments regarding his child;

(6) Complete an IDI within 30 days;

(7) Have reasonable rights of supervised visitation as arranged by Health and Human Services;

(8) Timely notify the court of any services he deems necessary to assist with return of the child to the parental home;

(9) Follow the rehabilitation plan of the court and also make reasonable efforts on his own to bring about rehabilitation.

The permanency objective at that time was reunification.

On June 25, 2018, the court held a continued disposition hearing. The court reiterated its prior directives and additionally ordered Kenneth to successfully complete a domestic violence program, to participate in therapy to address adjustment disorder, and to participate in Fathers for a Lifetime. The court ordered that the permanency objective remained reunification but also adopted a concurrent plan of adoption.

On September 11, 2018, the court held a review and permanency planning hearing and largely reiterated its prior order. The permanency objective remained reunification with a concurrent plan of adoption. The court additionally ordered that the parents should participate in relinquishment counseling as arranged by the Department.

On September 14, 2018, the guardian ad litem filed a stipulated ex parte motion for suspension of visitation and parenting time by parents of the juvenile, which motion was purportedly joined by the State and an attorney for the Department. An affidavit authored by Tiffiny Bohannon, the caseworker, was attached to the motion. Bohannon stated in her affidavit that Kentrell's mother was arrested and incarcerated on May 21 and charged with assault, a Class IIA felony, and intentional child abuse, a Class IIIA felony. She stated that a no contact order was in place with respect to Kentrell's mother following her arrest.

Bohannon further stated in her affidavit that a visitation supervisor reported that Kenneth became aggressive during Kentrell's medical appointment on September 10, 2018. Kenneth

grabbed Kentrell's arm and yelled multiple times despite the visitation supervisor warning Kenneth that the visitation would end if he did not get himself under control. Bohannon also stated that Kentrell's foster parent was present at the appointment and reported that Kenneth yelled and pulled Kentrell's arm "hard," which caused him to cry and go "limp" before the foster parent removed Kentrell from the situation. Based on Bohannon's affidavit, the motion alleged that Kentrell was seriously endangered during visitation, that visitation was contrary to his health, safety, or welfare, and that immediate suspension of visitation was necessary for his protection.

The court entered an ex parte order for suspension of visitation parenting time by the parents of the juvenile on September 14. The court held a hearing on September 21 to determine whether the order ought to remain in place for an extended period of time. It determined that visitations between Kentrell and his mother ought to remain suspended until reviewed in 90 days. However, the court overruled the ex parte motion to suspend Kenneth's visitation and parenting time.

On September 25, 2018, the State filed a third motion for termination of parental rights with respect to Kenneth. The State alleged that termination of Kenneth's parental rights was warranted under § 43-292(2), (6), and (7) and that termination was in Kentrell's best interests. With respect to § 43-292(2), the State alleged that Kenneth had substantially and continuously or repeatedly neglected and refused to give Kentrell necessary parental care and protection. With respect to § 43-292(6), the State alleged specific ways that reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to Kentrell's adjudication:

> (A) Kenneth has failed to obtain and maintain employment and provide proof.
> (B) Kenneth has failed to obtain and maintain safe, stable and appropriate housing and provide proof.
> (C) Kenneth has failed to complete a parenting class by June 1, 2018.
> (D) Kenneth has failed to complete a domestic violence class.
> (E) Kenneth has failed to successfully complete a domestic violence program.
> (F) Kenneth has failed to participate in therapy to address adjustment disorder.
> (G) Kenneth has failed to complete a budget.
> (H) Kenneth has failed to act appropriately during supervised visitation and/or medical appoints [sic] with the minor child.
> (I) Kenneth has failed to follow the rehabilitation plan of the court and also make reasonable efforts on his own to bring about rehabilitation.

With respect to § 43-292(7), the State alleged that Kentrell had been in an out-of-home placement for 15 or more of the most recent 22 months.

Trial on the third motion for termination of Kenneth's parental rights occurred on March 14, 19, 26, June 18, and August 5, 2019. The State called four witnesses: Bohannon; Kentrell's foster mother; Albert Sparks, who counseled Kenneth for a period of time; and Elizabeth Miller, who supervised the family permanency specialist. Kenneth testified on his own behalf and also elicited testimony from his sister.

Kentrell's foster mother testified that Kentrell was born in September 2015 and had been in her care continuously since August 2017. She said that Kenneth had never given her food, gifts,

or money for Kentrell during that time period aside from one outfit for Kentrell. She also said that Kenneth had never recognized or celebrated Kentrell's birthday through a phone call, gift, or card. Kentrell's foster mother testified that he received medical treatment for asthma, acid reflux, and ADHD and that he saw a specialist due to difficulty swallowing. She said that Kentrell had approximately 12 medical appointments from August 2017 through the time of trial, four appointments of which Kenneth attended. Kentrell's foster mother acknowledged that Kenneth attended visitations with Kentrell, which were always supervised, and that he spoke with Kentrell by telephone and never in a way that required her to terminate the call.

Sparks, who was Kenneth's therapist from September 24 through December 5, 2018, testified that Kenneth did not internalize his counseling and made little progress. After Kenneth completed an initial diagnostic inventory, Sparks developed a treatment plan that set goals for Kenneth of identifying and correcting behaviors in order to reunify with Kentrell, identifying stressors in his life, learning better personal values, and developing positive decisionmaking skills. Although Kenneth had weekly therapy appointments scheduled, he missed seven and cancelled one, which resulted in him only attending six appointments in total.

Sparks testified that Kenneth made no progress toward identifying stressors in his life and made "[v]ery minimal" progress toward learning better personal values. Instead of working to achieve the treatment plan goals, Kenneth tried convincing Sparks to see things from his point of view, discussing how he felt about the situation rather than discussing ways to model appropriate behaviors for Kentrell or ways in which he praised and disciplined Kentrell. Accordingly, Sparks identified Kenneth's feelings toward the legal system as a barrier to him making progress.

During a therapy appointment on December 5, 2018, Kenneth caused Sparks to become concerned for his safety. Sparks said that Kenneth began the appointment calmly but grew "very very agitated, possibly volatile or violent" as he raised his voice and gestured wildly. According to Sparks, Kenneth said that he needed to make people understand his truth and that the State needed to let him have Kentrell back because his son was his property. Kenneth left the session early, gesturing offensively to Sparks as he left. Sparks unsuccessfully discharged Kenneth at that time. Kenneth, however, denied that any verbal altercation occurred between Sparks and him.

Bohannon testified that she began as the family permanency specialist in this matter on May 10, 2018, while Kenneth was incarcerated and first met with him on June 8 following his release. In June, Kenneth reported that he was living with friends but would place himself on a housing waitlist, and he reported that he was working on applying to jobs. Bohannon testified that Kenneth did not complete a parenting course before June ended, which course the court had ordered him to complete by June 1.

During the review period from June 21 through September 11, 2018, Kenneth never completed a domestic violence course according to Bohannon. He did, however, begin participating in Fathers for a Lifetime. He also arranged for Bohannon to complete a walkthrough of his residence on August 31, during which Bohannon determined that his residence was not safe and appropriate for a child. She testified that Kenneth was living in the basement of a home and that the basement was not separated from the rest of the home in any way and had no locking door or full-size refrigerator or vents for heating and air conditioning. She observed inadequate food in a miniature refrigerator and a broken glass coffee table in the middle of the living room with "very

large shards of glass" exposed. Kenneth obtained employment during that review period. In July 2018, he provided a paystub from Burger King, and he provided a letter from another employer, First Star Fiber, that was dated September 14, 2018. He provided a letter from an auto body shop where he worked during that period as well. He also completed a budget for September.

Bohannon said that the barriers to reunification during the review period of June 21 through September 11, 2018, were employment, housing, and Kenneth's nonengagement in therapy and domestic violence courses. She also identified his attitude as a barrier: "[Kenneth] made it very clear that he did not believe that he needed to do these orders because he, in the previous case, had completed some of these services." She testified that she learned in May or June that Kenneth had remarried Kentrell's mother, which concerned her because instances of domestic violence between the two led to Kentrell's removal. Bohannon said that Kenneth told her that he remarried Kentrell's mother because he wanted to regain custody of Kentrell.

The next review period spanned from September 4, 2018, through February 27, 2019. Bohannon testified that she grew concerned for her safety during that time period after Kenneth threatened her in October 2018. She said that Kenneth told her that he would take away her children, "place them in the Kenneth [] agency," and that she would have "to fight like hell to get them back." Bohannon said that the threat took on more legitimacy because Kenneth had learned her personal address and telephone number.

Kenneth scheduled walk-throughs of his residence on October 1, October 24, and December 13, 2018, but failed to show up each time when Bohannon arrived. He scheduled a walk-through of a different residence on January 28, 2019, which walk-through Bohannon completed. Kenneth told Bohannon that it was his sister's residence and that she was allowing him to live there, but his sister never replied when Bohannon contacted her to confirm the veracity of that arrangement. Bohannon determined that the residence was safe and appropriate, but she testified that she was concerned that Kenneth did not actually live there. She said that she did not observe any clothing or toiletries that reasonably may have belonged to Kenneth. Additionally, when Bohannon had been at Kentrell's mother's home in December 2018, she saw Kenneth there as well and was told that he lived there.

Kenneth's sister testified that at the time of trial, he was living with her in the basement of her home. She testified that her basement had a separate entrance but no kitchen or bathroom. Kenneth testified that he had been living with his sister from May 2018 through the time of trial.

Bohannon testified that Kenneth's barriers to reunification during that time period included his failure to complete a court-ordered domestic violence program, lack of stable and safe housing, and inconsistent employment and proof of income. Although Kenneth worked for Majors Plastics for some period of time, Bohannon testified that he did not have a stable source of income. Kenneth completed a parenting program and provided a certificate of completion from Boys Town that was dated October 30, 2018. Kenneth told Bohannon that he had begun therapy with a different therapist on January 27, 2019.

Kenneth was discharged by a visitation agency in January 2019 due to the way he treated the visitation worker. He had previously been similarly discharged by visitation agencies in August 2017 and May 2018. Following a hearing on February 27, 2019, Kenneth began raising his voice and swearing at Bohannon. He told her that her family was "going to be cursed" by his family

members in the South. Bohannon testified that Kenneth called her names, said she was a racist, and threatened to sue the Department and her.

Bohannon said that she was concerned about ongoing domestic violence between Kenneth and Kentrell's mother because they told her after a hearing in March 2019 that they intended to coparent Kentrell following this matter's resolution. She testified that Kenneth had made minimal progress toward reunification as he had failed to complete court orders in a timely manner or overcome barriers to reunification. She said that the longest period of Kenneth's steady employment was one month. Bohannon testified that termination of Kenneth's parental rights was in Kentrell's best interests.

Kenneth testified that he was employed by Skinner Bakery at the time of trial and had worked at Marianna Industries from April through June 2019. He testified that he worked at Major Plastics before then and First Star Fibers from November through December 2018. Kenneth said that he was never fired and left each position voluntarily. Kenneth said that he took toys, diapers, extra clothes, and food to visitations with Kentrell. He acknowledged that he missed some visitations due to his work schedule and slept through one visitation, but he said that he attended most visitations.

On two occasions during trial, Kenneth's outbursts disrupted the proceedings. Kenneth grew argumentative with the presiding judge when he was asked to remain quiet and not act disruptively during Bohannon's testimony. Later during Bohannon's testimony, Kenneth remarked aloud, "you're lying," and he left the courtroom.

On August 21, 2019, following the close of trial but before the court entered its ruling, Kenneth filed a motion for posttermination visitation. Kenneth alleged that he had regularly exercised visitation and that it would be in Kentrell's best interests to have continued contact with Kenneth pending appeal of the matter if Kenneth's parental rights were terminated.

On September 5, 2019, the juvenile court entered its order to terminate Kenneth's parental rights. The court determined that the State had proved by clear and convincing evidence that termination of Kenneth's parental rights was warranted under § 43-292(2), (6), and (7) and that it was in Kentrell's best interests. The court specifically found, however, that the State had not proved that Kenneth failed to maintain employment. Additionally, the court specified that it found the testimony of Sparks, Bohannon, and Kentrell's foster mother more credible, reliable, and probative than the testimony of the other witnesses, including Kenneth.

The court noted that its best interest analysis was unavoidably tied to Kenneth's conduct and behaviors that were considerations under § 43-292(2) and (6). Much of the court's best interest analysis focused on the history of domestic violence between Kentrell's mother and Kenneth, his failure to address that domestic violence, his remarrying Kentrell's mother, and his intention to coparent with Kentrell's mother. The court found that Kenneth's motivation for marriage was to gain custody of Kentrell and that his continued relationship with Kentrell's mother and their living together demonstrated "deception" by them. The court further found that Kenneth's behavior, especially his conduct toward service providers, was a material barrier to reunification. Accordingly, the court terminated Kenneth's parental rights with respect to Kentrell. The court also held, "6. That at the time of the adjudication of the motion for termination of parental rights,

no request had been filed by any party to address visitation during the pendency of any appeal. Therefore, the court does not order visitation."

The court held a hearing on Kenneth's motion for posttermination visitation on September 10, 2019. Kenneth testified before resting, the State rested without presenting evidence, and the matter was continued to December 10 for the guardian ad litem's presentation of evidence. Kenneth's notice of appeal was then filed on October 3. On December 10, the motion came on for further hearing. The court summarized on the record an in-chambers conference held with all counsel. The court noted that it was mistaken in paragraph 6 of its September 5 order of termination when it said that no motion for posttermination visitation had been filed prior to termination. However, the court stated that since it had terminated Kenneth's parental rights, he lacked standing "to request visitation now." The court further stated that "perhaps" Kenneth's remedy was for the matter to be addressed on appeal, but acknowledged that the appellate court may deem it necessary to remand the issue back to the juvenile court.

Kenneth now appeals.

ASSIGNMENTS OF ERROR

Kenneth assigns that the court erred in finding that there were statutory grounds for the termination of his parental rights under § 43-292(2), (6), and (7); that termination of his parental rights was in Kentrell's best interests; and that it did not have jurisdiction to award visitation rights during the appeal's pendency.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

ANALYSIS

*Statutory Ground for Termination.*

In order to terminate parental rights under § 43-292, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in the section have been satisfied and that termination is in the child's best interests. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Only one statutory ground for termination needs to be proved in order for parental rights to be terminated. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

Kenneth's parental rights were terminated pursuant to § 43-292(2), (6), and (7). Section 43-292(7) provides for termination in cases where a child has been in an out-of-home placement for 15 or more months of the most recent 22 months. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

- 8 -

Kentrell was most recently removed from his parental home on July 18, 2017. The operative motion was filed on September 25, 2018. At that point in time, Kentrell had been living in an out of home placement for just over 14 months. However, the State offered and the court received exhibit 53, a certified copy of an earlier juvenile case involving Kentrell. The record in that case reveals that Kentrell was removed from his parents' home on March 2, 2016, and did not return until March 1, 2017. He then lived in the home of his mother until again removed on July 18, 2017, when the present case was initiated. The relevant 22-month period from the date the motion to terminate rights was filed stretches back to November, 25, 2016. Kentrell was in an out of home placement for just over 4 months pursuant to the orders in the prior case and then an additional 14 months in this case. Therefore, at the time the motion to terminate parental rights was filed, Kentrell had lived in out of home placements for 18 of the past 22 months. Thus, the State satisfied the requirement of § 43-292(7), proving the existence of a statutory ground for the termination of Kenneth's parental rights. We therefore affirm the juvenile court's finding on this point and turn to the issue of Kentrell's best interests.

*Best Interests of Child.*

When there exists a statutory ground for the termination of parental rights, the State must then show that termination is in the child's best interests. A parent's right to raise his or her child is constitutionally protected, so the State must also show that the parent is unfit before a court may terminate parental rights. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al., supra.* In discussing the constitutionally protected relationship between a parent and a child, our courts have held, """"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."""" *Id.* at 1033-34, 814 N.W.2d at 761. The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Nicole M., supra.*

In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. *In re Interest of Aaron D., supra.* In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse--as the other statutory grounds require--proof that termination of parental rights is in a child's best interests requires clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D., supra.*

In the present case, the evidence showed that Kenneth was acrimonious and threatening toward his therapist, the Department caseworker, and the juvenile court. The evidence also showed that Kenneth failed to work at overcoming many of the barriers to reunification that he faced. Kenneth only attended half of the therapy appointments with Sparks and refused to internalize reunification strategies or improve his parenting. Kenneth's engagement in therapy was only to the extent of explaining away his parental unfitness. Throughout the case, Kenneth demonstrated a proclivity for outbursts and behavior that caused fear in others, which sets a detrimental example for Kentrell. Kenneth's therapy with Sparks was terminated after Kenneth grew angry, raised his voice, and gestured offensively to Sparks, which caused Sparks to fear for his safety. In October 2018, he threatened to kidnap Bohannon's children, and in February 2019, he told Bohannon that his family members would curse her and her family. His behavior caused a visitation worker to discharge him in January. Additionally, Kenneth twice burst out during trial, first growing argumentative with the presiding judge and, later, calling a witness a liar.

Kenneth's behavior has caused actual physical harm to others as well. During Kentrell's medical appointment in September 2018, Kenneth yelled at Kentrell and pulled his arm so hard that he started crying and went "limp" before the foster mother intervened. Additionally, numerous witnesses referenced a history of domestic violence between, and perpetrated by, both Kenneth and Kentrell's mother. Despite an incident in which Kentrell's mother struck Kenneth with an automobile and injured both his ankles, Kenneth and Kentrell's mother nevertheless remarried. Kenneth has demonstrated parental unfitness through his threatening and violent conduct toward others, including toward Kentrell. It is in Kentrell's best interests that he not be subjected to the environment created by Kenneth's behavior.

Moreover, Kenneth demonstrated parental unfitness through his failure to complete court orders. In particular, he did not maintain safe, stable housing for any prolonged period of time. After not showing up for three scheduled walk-throughs of his residence in October and December 2018, he admitted Bohannon to complete a walk-through of a different residence in January 2019. That residence actually belonged to his sister, who testified at trial and confirmed that she was allowing Kenneth to live there. Kenneth testified at trial that he began living there in May 2018 despite having given Bohannon a different address in October and December 2018. Bohannon completed her walk-through of Kenneth's sister's home in January 2019 and found that it was safe and appropriate. However, she expressed doubts that Kenneth genuinely lived there because she observed no clothing or toiletries that might belong to him, and she had learned that Kenneth was living with Kentrell's mother in December 2018. Additionally, Kenneth and Kentrell's mother told her after a hearing in March 2019 that they intended to coparent Kentrell following this matter's resolution.

We are mindful that Kenneth demonstrated his employment at times throughout this case even if he frequently switched employers after short periods of time. Despite Kenneth having earned income however, Kentrell's foster mother testified that Kenneth provided nothing for Kentrell except for one outfit since she began caring for him in August 2017. Kenneth did testify that he took toys, diapers, clothing, and food with him to visitations; however, the juvenile court found the foster mother's testimony to be more credible, a finding we do not question on appeal. Additionally, we note that Kenneth's visitations with Kentrell never moved beyond being fully

supervised throughout this case. While Kenneth did eventually complete a court-ordered parenting course, his failure to timely complete that course caused prolonged separation from Kentrell.

The evidence demonstrates that Kenneth refused efforts to improve his parenting throughout the duration of this case. He failed to timely complete court orders. His behavior toward those persons who tried to help him was confrontational and included threats of violence and kidnapping. Based on our de novo review of the record, the evidence supports the juvenile court's finding that termination of Kenneth's parental rights was in Kentrell's best interests, and, thus, we affirm.

*Posttermination Visitation Pending Appeal.*

We addressed the issue of whether a juvenile court can allow visitation with a parent whose rights are being terminated in *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). We recognized there that although once the mother's parental rights were terminated, she no longer had standing to assert entitlement to continued visitation, the court still had continuing jurisdiction over the children until they reached the age of majority or were adopted. Based upon its continuing jurisdiction, the court had the authority to enter orders that are in the best interests of the children, including an order with respect to continued contact with a natural parent whose parental rights are being terminated. *Id.*

Before his parental rights were terminated, Kenneth filed a motion for posttermination visitation, but no hearing on the motion was held until after the court entered its termination order. In the September 5 order of termination, the court found that no visitation would be ordered noting that no motion was filed. The court recognized its error at the September 10 hearing and some evidence was adduced. The court at that juncture stated that it did have jurisdiction to consider the motion. However, when more time was needed for the evidentiary hearing than was available that day, it became necessary for Kenneth to file his notice of appeal prior to the motion being resolved. At the time the hearing was resumed, the court found that Kenneth lacked standing and if the issue could be resolved, it would have to be dealt with by the appellate court or by the juvenile court on remand. The court did not make any findings on the record as to the merits of the motion, but noted that the visitation issue may be moot if its order of termination is upheld on appeal.

We find it unfortunate that the juvenile court did not resolve the visitation issue either in conjunction with its order of termination or prior to the filing of the notice of appeal. While we agree that the court's order of termination did remove Kenneth's standing to assert his own rights to visitation, here as in *In re Interest of Stacey D. & Shannon D., supra*, the court retained jurisdiction to consider the child's best interests including whether the child should have continuing contact with his father. The juvenile court did not reach this issue. Therefore, we reverse that part of the juvenile court's order which denied continued visitation and remand the cause for further proceedings consistent with this opinion.

CONCLUSION

Based upon our de novo review of the record, we conclude that the State has proved by clear and convincing evidence that Kentrell has been in out-of-home placements for more than 15 months out of the last 22 months. We also conclude that termination of Kenneth's parental rights

is in the best interests of Kentrell. We further conclude that the juvenile court erred in not making a determination as to Kenneth's motion for continued visitation following the termination of his parental rights. Accordingly, we affirm in part, and in part reverse and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.